EMOR, INC., and Delcalo, Inc., Plaintiffs and Counterdefendants,

v.

CYPRUS MINES CORPORATION, Defendant and Counter-claimant,

v.

ALUMINUM COMPANY OF AMERICA, Counterdefendant.

Civ. A. No. 68–821.

United States District Court, W. D. Pennsylvania.

Dec. 1, 1970.

Opinion on Motion to Alter or Amend April 1, 1971.

Frank L. Seamans, of Eckert, Seamans & Cherin, Pittsburgh, Pa., for Emor, Inc. and Delcalo, Inc., plaintiffs and counterdefendants, and Aluminum Co. of America, counterdefendant.

Bruce A. Bevan, Jr., of Musick, Peeler & Garrett, Los Angeles, Cal., and W. Walter Braham, Jr., of Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for Cyprus Mines Corp., defendant and counterclaimant.

## OPINION AND ORDER

MARSH, Chief Judge.

This diversity ex-contractu case was tried non-jury. The stipulations of the parties were made part of the evidence. The Pennsylvania conflict of laws rules apply. Klaxon Co. v. Stentor Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The contracts to be construed are a Sales Agreement (PX 110) and a Letter Agreement (PX 146) which involved a sale by plaintiffs and counterdefendants, Emor, Inc. and Delcalo, Inc., of the assets and business of Rome Cable Corporation (Rome) to the defendant and counterclaimant, Cyprus Mines Corporation (Cyprus). Emor, Inc. and Delcalo, Inc. are wholly owned subsidiaries of the Aluminum Company of America (Alcoa) which guaranteed the performance of the Sales Agreement.

Emor, Inc. and Delcalo, Inc. are Delaware corporations, having their principal places of business in Pennsylvania. Emor, Inc. is the new name of Rome which was a Delaware corporation having its principal place of business in Rome, New York. Cyprus is a New

York corporation having its principal place of business in California. Alcoa is a Pennsylvania corporation having its principal place of business in Pennsylvania.

■ The last acts which put the contracts in force occurred in Pennsylvania on October 2, 1967, when Rome and Alcoa accepted Cyprus' written offer to buy Rome's assets, which contract became the Sales Agreement, and on October 31, 1967, when counsel for the parties signed the Letter Agreement. The closing was held in Pittsburgh on October 31, 1967, at which time the assets of Rome were transferred to Cyprus. In addition, it appears that Pennsylvania has the most significant contacts with the matters in dispute and was the center of gravity. Frankel v. Johns-Manville Corporation, 257 F.2d 508, 510–511 (3d Cir. 1958); Seneca Falls Machine Company v. McBeth, 368 F.2d 915 (3d Cir. 1966). Since the Sales Agreement and the Letter Agreement were made and to be performed in Pennsylvania, and that state was the center of gravity, the law of Pennsylvania applies to the interpretation and application of these agreements. The parties agree with this conclusion (see Stipulation of May 12, 1970, p. 3, item 10).

Hereinafter, for convenience, we will treat Alcoa as the seller of the assets of Rome to Cyprus.

The controversy involves the determination of the total purchase price which Cyprus is obligated to pay for the assets and business of Rome pursuant to the Sales Agreement and the Letter Agreement. The court finds that the total purchase price is $42,362,741 and the balance due Alcoa's subsidiaries is $1,261,520.

Although the contract documents were prepared by experts after lengthy investigation, reflection and discussion, the problems of interpretation presented are fraught with difficulty in the light of the unusual circumstances of the sale, extensive evidence presented, meticulous trial preparation and massive argumentation.

## History

In 1964, the Supreme Court of the United States held that Alcoa was in violation of Section 7 of the Clayton Act and ordered Alcoa to divest itself of the assets and business of Rome, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314. On April 27, 1966, Judge Brennan of the United States District Court for the Northern District of New York entered final judgment (PX 36) providing for such divestiture. This judgment substantially followed the consent judgment entered by the District Court in Rhode Island in the anti-trust case of United States v. Kaiser Aluminum & Chemical Corporation, Civil Action No. 2795, which ordered Kaiser (a competitor of Alcoa) to divest itself of Kaiser's Bristol, Rhode Island wire and cable plant (a competitor of Rome). Under the terms of the final judgment, Alcoa was ordered to sell the assets and business of Rome to such purchaser as would be approved by the Court and at a price which was to be "no less than the total of" several described amounts, two of which (and the ones relevant in this case) were as follows:

"(a) The adjusted book value of the land, plant and equipment of the Plants as of the date of sale, said adjusted book value being $16,238,000 as of December 31, 1964;

"(b) The book value as of date of sale of all raw materials, operating supplies, work in process, finished goods, plant inventories and finished goods inventories as the same appears on the books of Rome Cable before deducting reserves for lifo, except, however, that said book value shall be adjusted to include aluminum, copper and steel content at market value as of date of sale".

Cyprus began an extensive, broad and thorough investigation of the possible acquisition of Rome in June, 1967, which included a review of Rome's ac-

counting principles and practices, various financial analyses, market studies, studies of Rome's plant and equipment and their relative competitive efficiency, a review of sources of raw materials used in the manufacture of aluminum, steel and copper products, a review of Rome's employee benefit contracts and labor contracts, and the pertinent provisions of Judge Brennan's final judgment and the underlying evidence.

Cyprus was aware that other companies were also investigating the possible acquisition of Rome, and in early August, 1967, learned that Alcoa had received offers from two other companies at or above the minimum upset price provided in the final judgment. At the request of Cyprus, Alcoa agreed to make no other commitment for the sale of Rome until the Cyprus Board of Directors had acted on the matter.

Prior to August 25, 1967, Cyprus learned from Alcoa that the upset price calculations were in the range of $42,000,000 to $44,000,000.[1] Cyprus itself prepared an upset price calculation as of June 30, 1967 (PX 85, pp. 36, 37) showing an approximate total purchase price of $43,325,000 which was submitted to its Board of Directors. On August 18, 1967, the Cyprus Board authorized the acquisition of Rome "on the terms specified in the final judgment of the United States District Court for the Northern District of New York under date of April 27, 1966" in the anti-trust case.

It was the intention of Cyprus to purchase the assets and business of Rome as a going concern for a singular lump sum purchase price (PX 126) to be computed according to the provisions set forth in the Sales Agreement. Cyprus did not concern itself with whether the various assets of Rome were worth any particular amount. Many assets such as patents, trade secrets, licenses, leases, trademarks, customer lists and good will of Rome were not individually valued. Cyprus was principally concerned with the anticipated earnings of Rome in relation to the total approximate purchase price and other benefits that were expected to accrue, such as: the total approximate purchase price being at a low earnings multiple; the tax benefit which would accrue as a result of obtaining United States income against which to apply what would otherwise be excess foreign tax credits; the increase in the earnings per share of Cyprus stock which would result from Rome's earnings; the anticipated increase in return on total Cyprus capital; the opportunity to use Rome as a market for Cyprus' copper produced on the Island of Cyprus and copper produced in the United States by Pima Mining Company of which Cyprus owned a 50% interest;[2] the opportunity for forward integration of the copper industry; the opportunity to enter the aluminum business; the anticipated rapid growth in the insulated wire and cable market; and the anticipated total purchase price being realistic. Cyprus did not purchase the individual assets of Rome as part of a liquidation sale; it treated the purchase price of Rome as a lump sum consideration.

On the other hand, the sale of Rome was not an arm's length transaction. Alcoa in 1959 paid a total purchase price for Old Rome as a going business, which was some $13,000,000 more than the book value of Old Rome's assets. In 1966, after materially increasing Rome's profit making ability, Alcoa was compelled to sell Rome as a going concern by the divestiture order at a minimum upset price fixed by Court formulas. Alcoa's trading position was thus handicapped in its bona fide efforts to sell Rome at the best price possible (Tr., pp. 279-280).

On August 25, 1967, Cyprus prepared and transmitted to Alcoa six executed

---

1. Tr., pp. 3097-3098, 3106, DX 108, Rome's upset price and total calculations as of April 30, 1967; PX 413, as of May 31, 1967; PX 415, as of June 30, 1967.

2. Pima was the fifth largest copper producer in the United States in 1967.

copies of the Agreement of Sale. The Agreement was executed on behalf of Rome on October 2, 1967. The Agreement was duly submitted to the Justice Department which decided not to object. In early October the petition for approval of the sale to Cyprus was filed on behalf of Rome and Alcoa with the District Court for the Northern District of New York, to which the Sales Agreement was attached as an exhibit. Alcoa sent a draft of the petition to Cyprus. Officials of Alcoa and Cyprus attended the hearing in Utica, New York, and testified. On October 25, 1967, Judge Brennan entered an Order in which he approved of the sale (PX 131).

Under the provisions of the Sales Agreement the closing would have been held on December 31, 1967. However, Cyprus had requested an acceleration of the closing date to October 31, 1967, and Alcoa agreed.

The closing was held at the offices of Alcoa in Pittsburgh on October 31, 1967, at which time the assets and business of Rome were transferred to Cyprus.

The Sales Agreement provided that as soon after the closing date "as a balance sheet and related information as of the Closing Date shall become available," and "as soon as the report of Lybrand referred to in Paragraph 2(b) above shall become available", the purchase price was to be calculated and an appropriate adjustment was to be made by the parties (PX 110, paragraph 4). After the closing by invoice letter dated December 12, 1967 (PX 162), Alcoa submitted to Cyprus its calculation of the purchase price. By agreement, the parties dispensed with the Lybrand inventory letter. Thereafter, certain adjustments were made therein as a result of negotiations and of proceedings in this case (PX 422).

The purchase price calculated by Alcoa (including Rome's cash assets and Cyprus' pro rata share of property taxes) and including all adjustments was $44,686,068.

Of this purchase price, Cyprus paid on October 31, 1967, as a tentative purchase price, $41,101,221 (consisting of a cash payment of $40,500,000 and a credit of $601,221 for the cash assets retained by Emor).

The balance of the purchase price claimed by Alcoa to be due from Cyprus is $3,584,847 (PX 422).

By its counterclaim, Cyprus contends that it has overpaid. Cyprus' calculation of the purchase price was $38,178,260. Since it has already paid $41,101,221, Cyprus claims it is entitled to recover from Alcoa $2,922,961 on its counterclaim.

The items comprising the purchase price which Cyprus disputes are as follows:

| | | |
|---|---|---:|
| A. | The market value of the copper content of Rome's inventories as of October 31, 1967; | $ 4,109,317 |
| B. | The unamortized excess consideration paid by Alcoa in 1959 for the assets and business of Old Rome as of October 31, 1967; | 1,890,295 |
| C. | The adjustment to the overhead burden which was used in valuing Rome's inventories as of October 31, 1967; | 319,275 |
| D. | The inclusion in the expensed items inventory of items other than eleven specific categories of items; and | 111,000 |
| E. | The book value of Rome's land and plant at Collegeville, Pennsylvania. | 78,000 |

The items stated above which Cyprus disputes and are unresolved will be disposed of seriatim.

It is to be observed that the public accounting firm of Lybrand, Ross Bros. & Montgomery had served for many years as auditors for Alcoa and Rome, as well as for Cyprus and Pima Mining Company. Cyprus agreed that any audit work in determination of the purchase price under the Sales Agreement would be performed by Lybrand. Lybrand reviewed the balance sheet of Rome as of October 31, 1967, and concluded that it had been prepared in accordance with generally accepted accounting principles

applied on a consistent basis, with three exceptions agreed upon by Cyprus prior to closing. Also, Lybrand reviewed Alcoa's calculation of the purchase price as set forth in the December 12, 1967, invoice letter and concluded that it had been calculated in accordance with the Sales Agreement and the Letter Agreement, except that Lybrand took no position with regard to the market value of the copper content of Rome's inventories pursuant to paragraph 2(b) of the Sales Agreement. As heretofore stated by agreement of the parties, Lybrand did not issue the letter reviewing a summary of the inventories as required by the Sales Agreement.

Cyprus on or about November 8, 1967, retained the public accounting firm of Price Waterhouse & Company to review Rome's records and books, and advise Cyprus whether the Alcoa invoice for the purchase price, which was to be submitted in due course, had been properly prepared; whether any items in the Sales Agreement and Letter Agreement were unfair to Cyprus; and advise it with regard to any points Cyprus could use in negotiating and bargaining with Alcoa over the ultimate purchase price, including any tax consequences to Alcoa resulting from the sale of Rome. Price Waterhouse refused Alcoa's invitation to attend meetings during the week of December 4, 1967, at which the final purchase price was to be calculated by Alcoa and Lybrand.

Price Waterhouse reported to Cyprus about January 11, 1968. This report was not signed on behalf of Price Waterhouse and at Cyprus' request was not sent to Alcoa or Lybrand.

*The Market Value of the Copper Content of Rome's Inventories as of October 31, 1967.*

The Sales Agreement of October 2, 1967, provided in paragraph 2(b):

"Raw materials, operating supplies, work in process, finished goods, plant inventories and finished goods inventories shall be valued in accordance with the values appearing on the books of Seller on the Closing Date before deduction of reserves for Lifo, it being understood that the inventories will be valued at the lower of cost or market with cost being determined for all inventories except returnable reels under the moving average method; returnable reels will be costed using the first-in first-out or identified cost methods. These methods are the same as the Seller has consistently used. *By way of exception of the foregoing the aluminum, copper and steel content of inventories shall be valued at the higher of market value or cost thereof on the Closing Date— with cost being determined on a first-in first-out basis without deduction of reserves for Lifo.* (It is understood that substantially all inventories are carried by the Seller at the lower of cost or market, with cost being determined for substantially all inventories, except returnable reels, under the last-in, first-out (Lifo) method and the appropriate reserves will be recorded on the books of the Seller to reduce the inventories, as recorded above, to such method of valuation for financial reporting and tax purposes.)

"Such inventories shall be physical inventoried as of September 30, 1967 by Rome personnel in the presence of any representatives which the Buyer shall choose to designate. Any difference between said assets as recorded on the books of Seller and the physical inventory shall result in appropriate adjustment on the books of Seller.

"At the Closing Date, Rome personnel will prepare a summary of the inventories described in the preceding paragraph as recorded in the accounts of the Seller without consideration of the Lifo reserves. *The value of aluminum, copper and steel content of the inventories included therein shall be deducted from the summary and in place thereof there shall be added the aluminum, copper and steel content of the inventories valued at the higher of market value or cost thereof, with cost*

*being determined on a first-in, first-out basis.*

"Lybrand, Ross Bros. & Montgomery (Lybrand) will make an examination of the recorded inventories as of September 30, 1967, review the transactions in the inventory accounts between such date and the Closing Date, and the summary of inventories, including adjustments, prepared as of the Closing Date, all on a test basis in accordance with generally accepted auditing standards. *Lybrand will furnish to each of the parties hereto a letter stating that, in their opinion, the amount of the inventories, as adjusted, shown on the summary as of the Closing Date, is fairly stated in accordance with the terms and provisions of this Agreement.*" (Emphasis supplied.)

It is not denied that after the closing date, the parties did not want the Lybrand accountants to determine "market value" of the inventories and agreed to dispense with the Lybrand letter.

As of October 31, 1967, the copper content of the inventories of Rome was 22,889,729 pounds broken down in the following forms:

| | | |
|---|---|---|
| Scrap | 2,526,360 | pounds |
| Raw materials (wire bar) | 3,508,507 | pounds |
| Work in process | 4,753,089 | pounds |
| Finished goods | 12,101,773 | pounds |

Prior to preparing the Sales Agreement, Cyprus was aware of Rome's metal accounting method. By this method the copper, aluminum and steel content of Rome's inventories was recorded in Rome's books in separate metal value accounts for each of these metals. These accounts recorded the total weight and cost of these metals in their basic raw material forms and without regard to the physical forms in which the metals actually existed in the inventory as scrap, raw material, work in process and

finished goods. The metal value account for copper was so recorded and maintained in the basic raw material form of electrolytic wire bar. The added cost that accrued during the manufacturing of products containing the metals was maintained in separate conversion accounts. The cost of converting copper scrap back to wire bar was maintained as a credit or offsetting amount in a separate account and was not posted to the copper metal account.

Under the concept of metal value accounting as used by Rome and other metal fabricators, the "copper content" of Rome's inventories means the total weight of copper recorded in Rome's copper metal value account in its basic raw material form of electrolytic wire bar.

During the investigation by Cyprus, Alcoa exhibited to it and other potential purchasers upset price calculations in order to give them an approximation of the price required to purchase Rome (see f. n. 1). In these calculations the metal content inventories were calculated on the basis of Fifo cost [3] of copper wire bar,[4] and the Fifo cost of the raw material forms of aluminum and steel. During this period, Fifo cost of Rome's copper wire bar and the open market prices on the New York Merchant and Dealer Market (hereafter Dealer Market) were relatively close.

Alcoa used Fifo cost in the upset price calculations for the purpose of reflecting an approximation of market value on the basis of recent prices paid by Rome for electrolytic wire bar and the basic raw material forms of aluminum and steel. Cyprus was aware of this fact. On June 12, 1967, Cyprus was shown the April 30th, 1967, upset price calculation (Tr., pp. 3097–3098, 3106, 3125, DX 108). It stated that the "book value has been adjusted to include aluminum, copper and steel content at market value as of April

3. Fifo cost means first-in first-out, and it is an accounting procedure to arrive at cost of inventory which generally reflects a higher cost than the moving average cost and the Lifo procedure, which means last-in first-out.

4. Wire bar is sometimes designated as electrolytic wire bar and refined copper.

30th, 1967". The final judgment prescribed "market value". The upset price calculations received by Cyprus for May 31st (PX 413) and June 30th (PX 415) stated that the book value of the metal content had been adjusted to reflect the "prices paid" for the metal content.

During preliminary discussions, both Alcoa and Cyprus were aware of a strike against the major United States copper producers which had started in mid-July, 1967. This strike continued until the end of March, 1968. During the first month following commencement of the strike, the price of copper in the open market declined because copper fabricators had accumulated large inventories in anticipation of the strike. The strike and its repercussions were a subject of discussion and speculation among Cyprus officers. Because Cyprus was a copper company, its officers constantly looked at the price of copper in various trade publications and trade reports regularly published by Ametalco, Inc., Cyprus' selling agent. Cyprus' President and Chairman of the Board, Henry T. Mudd, was frequently provided, at his request, with information regarding copper prices.

A meeting to discuss the terms of the sale was held in Los Angeles on August 15, 1967. In attendance were Leon E. Hickman, representing Alcoa, and Chairman Mudd and other officials for Cyprus. Among those present were two experienced lawyers: Hickman for Alcoa and Gerald G. Kelly, general counsel for Cyprus. All the negotiators were well aware that the Dealer Market was an open market which reflected prices according to supply and demand. All were aware that United States and Canadian producer prices ordinarily did not vary with supply and demand. Price changes were mentioned and discussed indicating that the participants were thinking in terms of the fluctuating Dealer Market rather than the stable producer price. Mudd testified at his deposition that during the strike "the price of copper was so turbulent" (Tr., p. 2104), meaning that the market rises very quickly and subsides very quickly from time to time (Tr., pp. 2107–2108) —only the open market behaves in this manner. Thus, when Mudd testified that he thought "cost" was fair because Alcoa would be protected from loss "if the market went down" (Tr., p. 2134), he was necessarily referring to the open market price of copper which is represented in the Dealer Market.

The participants must have been aware that the price of wire bar in the Dealer Market had declined approximately 10 cents per pound since January, 1967 (56.38 cents) to August 11, 1967 (46.5 cents), the Friday preceding the meeting on August 15th. The Dealer Market price had declined slightly from the beginning of the strike in mid-July (48 cents) to August 11, 1967 (46.5 cents). There had been no change in the United States or Canadian producer prices of copper from January to August 15, 1967. During this period the United States producer price was about 38 cents per pound, and the Canadian producer price was 44 cents per pound (PX 390; PX 391).

Alcoa's calculations of "market value" of its copper inventory for the months of April, May and June, of which it advised Cyprus, averaged 49 cents per pound. The prices in the Dealer Market during those months averaged 45 cents per pound. The figures furnished by Alcoa's accountants to Cyprus were based on Fifo costs which injected a confusing and misleading element with respect to "market value".[5] However, if

5. The accountants of Alcoa and Rome, before the execution of the Agreement, did not know what was meant by the term "market value" as used in the divestiture Order, but were groping for "market value" by using Fifo cost (DX 100, Accountant Healy; DX 103, Accountant Mahrer; DX 110, Accountant Healy; Note: Lawyer Hickman's explanation of the accountants' dichotomy, Tr., pp. 514–517; DX 116 and DX 117, calculations prepared by Rome's accountants). The accountants wished to use Fifo cost because in the second quarter of 1967 for

there had been any confusion on the part of the Cyprus officers in thinking Alcoa intended "market value" of the copper, aluminum and steel content of Rome's inventories to mean Fifo cost thereof, such confusion was effectively dispelled during the period between August 15 and August 25, 1967, when Alcoa insisted that the copper, aluminum and steel content of Rome's inventories be included in the purchase price at the higher of market value or Fifo cost, and emphatically rejected Cyprus' proposals to use Fifo cost alone (PX 104, PX 105, PX 102, p. 4, PX 107, PX 108, pp. 4, 6).

Alcoa desired that "cost" be included in the formula so as to prevent a loss in the event market value would drop below cost at the date of closing, which precaution was in keeping with the intent of the final judgment that Alcoa was not to suffer a loss in the sale of Rome.[6]

At about the time of the meeting, the purchase price for Rome was higher if copper wire bar was calculated at Fifo cost (48.5 cents as of July 31st) than if calculated at current Dealer Market prices (46.5 cents) for wire bar.

Following the discussion with Hickman, Cyprus' officers met. They discussed the fact that they knew the approximate Fifo cost of copper wire bar, but would not know its market value until the closing date. The consensus was that the market value would not exceed Fifo cost by the closing date, and that they would take the "risk" in this regard (Tr., pp. 2218–2220, 3158–3162, 2134, 2107–2108). Thus, again, since domestic and Canadian producers' prices

of copper wire bar had been constant during 1967 at about 38 cents and 44 cents per pound, respectively, we are convinced that the Cyprus officers were thinking of copper prices in terms of the fluctuating Dealer Market as of the closing date.

Chairman Mudd made the decision that Cyprus would make an offer to purchase Rome on the basis that copper, aluminum and steel content of Rome's inventories would be included in the purchase price at the higher of market value or Fifo cost.

With respect to the copper strike, Mudd confessed that he "was wrong all the way through. * * * [He] thought it would end almost momentarily." This thought may well have prompted his ultimate decision to take the risk against a rise in the market price and agree that the purchase price of Rome would include copper content of Rome's inventories at the "higher of market value or [Fifo] cost."

At no time during preliminary discussion in Los Angeles was the term "copper content" articulated by the parties to mean anything different from the customary usage of that term by Rome, i.e., the total weight of copper recorded in Rome's copper metal value account in its basic raw material form. This was the general and customary usage of that term by the industry. "Cost" of the metal content of inventories specified to be Fifo cost had reference to Rome's metal value accounts. *Sub silentio*, both parties were thinking of copper content in terms of electrolytic wire bar, and of

25,500,000 pounds of copper, the asking price amounted to over $2,000,000 more than Alcoa then could have obtained under the standard legal definition of "market value". After the Agreement of Sale was executed, the Alcoa accountants still had no clear idea what "market value" as used in the Agreement meant (DX 130, Accountants Mahrer and Healy; see testimony of Accountant Mahrer, Tr., pp. 1095–1100). After the dramatic price rise in the latter part of October, 1967, it appears that the Alcoa legal department quite naturally "enlightened" the

Alcoa accountants as to the legal concept of "market value" of metal content as one of the formulas (2(b)) set forth to measure the purchase price of Rome as distinguished from the selling price of Rome's products manufactured and to be manufactured from the metals in the inventories.

6. In April, 1966, when the divestiture Order was handed down by Judge Brennan, the market value of copper wire bar was well above the inventory cost (PX 427; Tr. p. 280; defendant's graphic exhibit DX 193b).

aluminum and steel in terms of their basic raw material forms pursuant to the concept of metal value accounting.

At no time during the preliminary discussion in Los Angeles was the term "market value" of the metals articulated by the negotiators for the parties to mean anything different from the standard legal definition of market value involving a willing buyer and a willing seller. Since the strike had dried up domestic sources of copper, the negotiators, *sub silentio*, expected market value to be determined in accordance with the legal definition from quotations on the open market, i.e., the Dealer Market.

The Dealer Market is traditionally known as a free and open market with prices therein being affected by supply and demand similar to a free and open market for any other commodity. In 1967, Rome purchased over half of its requirements for copper wire bar in the Dealer Market, and Cyprus, through its agent Ametalco, sold its Pima copper at or near the prices prevailing in the Dealer Market. After the sale, from November, 1967, through March, 1968, Rome Cable Division of Cyprus purchased its copper wire bar in the open market at prices averaging 62½ cents per pound.

It is doubtful that "market value" of copper wire bar from the legal standpoint could ever be determined from United States and Canadian producers' prices since they sold their refined copper on the basis of long-term contracts which provided for periodic deliveries during the terms. Generally, the production of producers is committed for a year under these term contracts. The primary producers in the United States sold their refined copper at a price which they determined and published from time to time. The producer price was relatively stable; it did not fluctuate in response to supply and demand, but remained at the same level for extended periods until a new price was published. The same was true of primary Canadian producers who sold wire bar in the United States. Since 1964, the amount of copper which copper fabricators had been able to purchase from domestic and Canadian producers had been determined by allocations established by producers on the basis of prior purchasing positions of the fabricators with the producers. Sales which are restricted to old customers or are merely in satisfaction of long-term commitments are not relevant evidence of market value. Vogelstein & Co. v. United States, 262 U.S. 337, 340, 43 S.Ct. 564, 67 L.Ed. 1012 (1923); Parrott v. Allison, 145 F.2d 415 (2d Cir. 1944). In our opinion, producers' prices do not reflect market value in the accepted legal concept of that term.

In any event, during the strike when the domestic producers were closed down and whose prices *were not even quoted* during the latter part of October, 1967, to the latter part of February, 1968, market value of copper wire bar as of the closing date could not be determined from that former source of supply (PX 390, PX 391).

The market price of copper wire bar on the Dealer Market on October 31, 1967, was 64 cents a pound. The Fifo cost thereof on that date was 46.05 cents a pound. (See Stipulation, March 20, 1970.) The open market prices on the London Metal Exchange and the New York Commodity Exchange on October 31, 1967, were consistent with the market price of wire bar on the Dealer Market. The Dealer Market was the only domestic source for substantial quantities of copper wire bar freely bought and sold on the closing date, and that source was sufficient to satisfy the normal requirements of copper fabricators in the United States.[7] The market value of copper wire bar on October 31, 1967, was the market price at which it was being freely bought and sold on that date. The market value of the copper

---

7. Imports of refined copper during the fourth quarter of 1967 were 298% of the fourth quarter imports during the years 1964–1966.

content of Rome's inventories on October 31, 1967, was 64 cents a pound which was higher than the Fifo cost of the copper content of Rome's inventories.

■ Thus, the 64-cent figure is the one to be used in that segment of the formula (2(b)) in calculating the total purchase price of Rome from the standpoint of the copper inventory. The identical concept was used in calculating the market value of the steel and aluminum inventories.

After the closing date, Alcoa calculated Rome's inventories in accordance with paragraph 2(b) of the Agreement.

Lybrand concurred with the basic method used by Alcoa in determining the market value of the copper content of Rome's inventories pursuant to paragraph 2(b) on the basis of the market price of copper wire bar on this closing date. Inconsistently, Alcoa computed the copper scrap in its inventory at 49.-001 cents per pound, but after the Complaint was filed, the inconsistency was corrected in paragraph 7 of its Amended Complaint.

■ The primary object in the interpretation of any written instrument is to ascertain and effectuate the intention of the parties. The Sales Agreement is an integrated contract. The gentlemen who prepared and assented to it were highly knowledgeable of the operative uses of the copper business and familiar with all the circumstances. All desired to state the precise terms to be used to calculate the total purchase price of Rome. The standard of interpretation applicable in such a case is that of a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended it to mean. The parties here have assented to the Sales Agreement; therefore, its terms are conclusive, even though with respect to "copper content" and "market value" it may have a different meaning from that which either party supposed it to have. Restatement, Contracts, § 230, Comment b.[8] A contract may be created though each party attached a different meaning to the language used. Williston on Contracts (3d ed.), § 606.

■ As stated, the buyer and seller did not undertake to spell out in detail the meaning of those two terms. Thus in applying the principle of § 230, Restatement, Contracts, in the light of the operative usages and the circumstances, "copper content" as used in paragraph 2(b) of the Agreement should be held to mean the total weight of copper content of Rome's inventories on October 31, 1967, as measured by its raw material form of electrolytic wire bar.

This would also be the meaning of "copper content" to a reasonably intelligent person dictated by the customary practice and understanding among copper fabricators, and particularly Rome, whose metal accounting practices were definite and well known to Cyprus. Restatement, Contracts, § 235(b).[9] We find as a fact that the "copper content" to be valued had been expressed by Alcoa and acquiesced in by Cyprus in terms of wire bar. See the three upset price calculations (DX 108, PX 413, PX 415) which were based on the total weight of copper wire bar and the raw material

8. Cf. Newspaper Readers Service v. Canonsburg Pottery Co., 176 F.2d 945 (3d Cir. 1949); Koplin v. Franklin Fire Ins. Co., 160 Pa.Super. 182, 50 A.2d 746 (1947); Tudesco v. Wilson, 163 Pa.Super. 352, 60 A.2d 388 (1948); Markides v. Soffer, 172 Pa.Super. 215, 93 A.2d 99 (1952).

9. 17 Am.Jur.2d, Contracts, § 251; McDonough v. Jolly, 165 Pa. 542, 30 A. 1048 (1895). Evidence of the way in which Rome used "copper content" in its business is relevant to show the meaning of that term. White Heat Products Co. v. Thomas, 266 Pa. 551, 109 A. 685 (1920); Koplin v. Franklin Ins. Co. of Philadelphia, 158 Pa.Super. 301, 44 A.2d 877 (1945); Morse-Boulger Destructor Co. v. Mellon-Stuart Co., 185 Pa.Super. 316, 138 A.2d 152 (1958).

forms of the other metals, as such weights were recorded in Rome's metal value accounts for these metals.

It is even more apparent in applying the principle of § 230 to "market value", as used in paragraph 2(b), that the operative usages and the circumstances which existed during the copper strike when the Agreement was negotiated and executed meant the price which would on the closing date[10] be the "market value of copper wire bar from the legal standpoint", i.e., the price agreed upon by a buyer willing but not obligated to buy, and a seller, willing but not obligated to sell electrolytic wire bar.[11] This would be the expected meaning to be attached to market value by the two experienced lawyers who negotiated and finally approved that term in the Agreement, as well as by the two Judges who used the term in the divestiture Orders of Kaiser and Rome. All would be expected to have a long-standing familiarity with the legal definition of market value, whereas it would be unlikely that they would be familiar with the complex accountant's theory of estimated market value in terms of the net realizable value of the copper content in a fabricator's products.[12]

We find nothing in the evidence which so much as suggests that Cyprus, prior to executing the Agreement, entertained the accounting theory of determining a fabricator's net realizable value of copper content and equating that with market value as of the closing date. If Cyprus actually had that intention, its silence is astounding. That theory is further precluded by the fact that on the closing date only an estimate of net realizable value of copper content could be obtained through the use of a computer,

and would require about six months thereafter to obtain an accurate figure of what Rome would eventually realize from the copper content of its products after they were sold, to say nothing of what it would realize from the steel and aluminum content of its products after they were sold. A six-month delay in calculating the adjusted purchase price for Rome was never suggested or contemplated.

After the meeting in Los Angeles, Cyprus was quite concerned when Alcoa insisted that the metal inventories should be valued "at the higher of market value or cost" on the closing date. Its failure then to spell out or even mention the accounting theory of equating market value with net realizable value is quite persuasive that "market value" with regard to copper wire bar and the raw material of steel and aluminum content was to be determined as the negotiators understood it, by the standard legal usage and definition of the term. After all, the thing Cyprus was buying was an entire company comprised of many individual assets, tangible and intangible; Cyprus was not buying finished products of Rome, its scrap metal or its inventories as such. The market value of copper wire bar on the closing date was one of the measuring sticks to be used in arriving at the total purchase price of Rome.

Cyprus argued that it is not permissible in interpreting the Sales Agreement to consider the letters (PX 161, PX 155, PX 157, PX 160) which passed between Cyprus and Alcoa following the closing date and after the dispute arose. Alcoa construes the letters as conduct of the parties and conclusive of the meaning of the agreement.[13] In view of the findings, this dichotomy need not be re-

---

10. When the Sales Agreement was executed on October 2, 1967, the closing date would have been December 31. 1967, but Cyprus requested that the closing date be advanced to October 31, 1967, to which request Alcoa agreed.

11. United States Steel Corp. v. Board of Assessment & Revision of Taxes, 422 Pa. 463, 223 A.2d 92 (1966); 17 Am.Jur.2d,

Contracts, § 249; Restatement, Contracts, § 234.

12. See testimony of Bruce Furman Smith, Tr., p. 3612 et seq.; PX 361, DX 195a.

13. Cf. Restatement, Contracts § 235(e), and Illustration of Clause (e): 11; Pittsburgh Railways Co. v. Equitable Life Assur. Soc., 288 F.2d 640 (3d Cir. 1961).

solved, but it is quite revealing that Mudd in his November 30, 1967, letter to Alcoa (PX 155) seems to agree with Alcoa (1) that the Agreement specified two distinct dollar amounts, one being market value and the other being Fifo cost; (2) the subject *res* that was to be valued was electrolytic wire bar; (3) "market value" was used in paragraph 2(b) from the "legal standpoint", meaning the price which a willing seller and a willing buyer would agree upon for a sale and purchase of copper wire bar on the closing date; (4) "market value" was to be determined on the basis of the market price of copper wire bar on the closing date from available source or sources; (5) the United States producer price should not be used to determine "market value" because of the general unavailability of copper from the United States producers on the closing date.

Mudd erroneously believed that copper wire bar was available from Canadian producers at the Canadian producer price of 44 cents per pound. It is an undisputed fact that copper fabricators in the United States could not make new purchases of wire bar from Canadian producers at the Canadian producer price on the closing date.

It is especially revealing that Mudd's letter written with the assistance of Cyprus' general counsel and other expert personnel in which Mudd was attempting to be as accurate as possible (Tr., p. 2111) indicated that Cyprus had researched the market price of wire bar on October 31, 1967, from recognized sources. This must have included the Dealer Market where Cyprus was selling and Rome was buying copper wire bar. Thus, it seems exceedingly strange that this carefully prepared letter made no mention of the accounting theory of net realizable value being the market value of the copper content, which theory was so strenuously and ingeniously litigated. The facts and circumstances are con-

vincing that the accounting theory was an afterthought borne perhaps of an accounting definition of the word "market" when used in the phrase "lower of cost and market",[14] which theory originated with the representative of Price Waterhouse & Company who worked at Rome after October 31, 1967 (Tr., pp. 2089–2091, PX 204).

The finding that the market value of the copper content of Rome's inventories on October 31, 1967, was 64 cents per pound is challenged by Cyprus on the thesis that this market value should be disregarded because the strike against the major United States producers created a highly abnormal, unusual and peculiar circumstance in the United States copper market.

This strike was in progress throughout the negotiations and execution of the Sales Agreement.

Copper prices on the open market have been traditionally influenced by events occurring in various parts of the world, such as strikes and other labor disturbances (affecting either producers or consumers), transportation difficulties, wars, political statements, changes, disturbances, and economic conditions.

The price which prevailed in the open market on October 31, 1967, was not a "peculiar circumstance". Open market prices for copper wire bar have been higher than 64 cents for substantial periods during each of the years from 1965 to 1970 (PX 390; PX 391). The open market prices of copper have fluctuated widely over these years (Tr., pp. 2334, 2367, 2380, 4011). During the trial the market price was around 66½ cents per pound (Tr., pp. 2149, 2166).

■ Since there was general buying and selling in the Dealer Market on October 31, 1967, the fact that the market value of copper wire bar on that date was affected by the strike is not relevant.[15]

---

14. See Accounting Research Bulletin 43, Chapter 4, Statement 6 (DX 96).

15. United States v. New River Collieries, 262 U.S. 341, 43 S.Ct. 565, 67 L.Ed. 1014 (1923), affirming 276 F. 690 (3d Cir. 1921); C. G. Blake Co. v. United States, 275 F. 861 (S.D.Ohio 1921), aff'd 279 F. 71 (6th Cir. 1922).

Even if facts occur after a contract is entered into which make performance thereof more difficult or expensive than was previously anticipated, performance under the contract is not thereby excused. Restatement, Contracts, § 467; Wissahickon Realty Corporation v. Boyle, 385 Pa. 198, 122 A.2d 720 (1956); 6 Corbin, Contracts, § 1333.

The market value of the copper content of Rome's inventories as of October 31, 1967, was properly computed in arriving at the total purchase price of $44,-686,068.00, and the balance of the purchase price of $3,584,847 claimed to be due from Cyprus should not be reduced with respect to this dispute (PX 422).

*The Unamortized Excess Consideration Paid By Alcoa in 1959 For The Assets and Business Of Old Rome as of October 31, 1967.*

The Sales Agreement provided in paragraph 2(a):

"Land, plant and equipment shall be valued at their adjusted book value on the Closing Date after allowance for depreciation and amortization, the book value thereof being subject to adjustment resulting from the allocation to said assets and the inclusion in 'Adjusted Book Value' of the amount by which the consideration paid by Alcoa in 1959 to the former Rome Cable Corporation for its assets and business exceeded the book value of said assets, which excess has been and is being amortized at the rate of a million dollars per year. The valuation of land, plant and equipment on this basis on June 30, 1967 was $12,-718,000."

In Alcoa's invoice to Cyprus, the unamortized excess consideration was calculated to be $5,061,667 (PX 162, Schedule A). Cyprus contends this figure is excessive.

It is our view that Cyprus is correct; that Alcoa's calculation is excessive. We calculate the unamortized excess consideration to be $3,135,615.

By letter dated January 21, 1959, Alcoa offered to purchase all the assets and business of Old Rome for 355,226 shares of the common stock of Alcoa. The offer was subject to various conditions, such as necessary corporate action, a favorable ruling from the Internal Revenue Service, and various warranties. A formal agreement was contemplated in Alcoa's offer. Old Rome's Board, pursuant to a resolution, executed its consent to the offer on January 22, 1959. On February 17, 1959, Alcoa and Old Rome entered into a formal Plan and Agreement regarding the business and assets of Old Rome (Stipulation, March 20, 1970, paragraph 8).

Under Section 20 of the New York Stock Corporation Law and the formal agreement, the affirmative vote of holders of two-thirds of the common stock of Old Rome was required to approve the sale; also under the formal agreement the obligations of the parties were subject to the satisfaction of certain conditions. At a special meeting on March 25, 1959, the stockholders of Old Rome approved the sale. Under the plan each of Old Rome's shareholders was to receive six-tenths of a share of Alcoa stock for each share of Old Rome stock. On March 31, 1959, all the conditions having been satisfied, the transaction was closed. The market value of Alcoa's stock on January 22, 1959 was $85.375 per share; on February 17, 1959, it was $82 per share; on March 25, 1959, it was $81.75 per share; and on March 31, 1959, it was $80.375 per share (Stipulation, March 20, 1970, paragraph 13).

The value of the 355,226 shares of Alcoa stock greatly exceeded the book value of the assets of Old Rome. Alcoa calculated that it paid a total consideration of $30,327,420 for Old Rome. This amount was determined by multiplying the 355,226 shares of Alcoa common stock by $85.375, the market value on January 22, 1959. This valuation date was selected by Alcoa's legal counsel and was based in part upon advice received

from its independent certified public accountants. The book value or net worth of Old Rome on March 31, 1959, the closing date, was $16,832,342 (Stipulation, March 20, 1970, paragraph 10). As part of the closing, $150,000 of Old Rome's cash was retained as an estimated sum with which to pay closing expenses. Any unused portion was to be returned to Alcoa.[16] Subtracting $150,000 from the book value of $16,832,342 left a balance of $16,682,342.

The excess consideration which Alcoa calculated in 1959 that it paid for Old Rome over the book value was determined by subtracting $16,682,342 from $30,327,420, the total consideration. Thus, the excess consideration, as determined by Alcoa, was $13,645,078 (Stipulation, March 20, 1970, paragraphs 9, 10, 11, 12, 13). Alcoa amortized the excess consideration at the rate of $1,000,000 per year over a period of 13 plus years (DX 63, p. 2).

On November 20, 1959, Alcoa changed its accounting treatment of the transaction from that of acquisition to the "pooling of interest" theory, under which excess consideration was not entered upon its books. Excess consideration has not appeared on Alcoa's balance sheets since 1959. The unamortized excess consideration as of October 31, 1967, was not set forth on Rome's balance sheet as of the closing date (PX 162).

Alcoa's invoice consistent with its use of the January 22, 1959, valuation date contained an amount of $5,061,667 as representing the unamortized excess consideration due from Cyprus pursuant to paragraph 2(a) (PX 162, Schedule A).

The prevalent accounting practice in 1959 with respect to the date used for valuing stock given as consideration in a business acquisition or combination was to value the stock on or prior to the date that negotiation was concluded (PX 227).

Alcoa has good reasons for selecting January 22, 1959, to be the valuation date and, as between Alcoa and Old Rome, it was a proper selection. Of course, the uncontemplated 1967 sale to Cyprus was not one of the reasons. The propriety of Alcoa in using the January 22nd valuation date cannot be questioned in paying Federal Stock Issuance and Transfer Taxes; in complying with § 603 of the Pennsylvania Business Law; in advising Old Rome stockholders that the 355,226 shares of Alcoa common stock to be paid by Alcoa would be valued as of January 22, 1959; in listing the 355,226 additional shares as of January 22nd with the New York Stock Exchange; and in evidencing that date in the 1965 and 1966 divestiture proceedings in the District Court for the Northern District of New York (Request for Admission 38, Ex. C, DX 202).

Cyprus contends that the appropriate date for valuing Alcoa's stock to determine the total consideration paid by Alcoa to Old Rome's stockholders is March 31, 1959. If that date is used the value of its stock and the total consideration was $28,551,290. Of the $150,000 retained by Old Rome for expenses in 1959, all but $35,836 was eventually delivered to Alcoa. Therefore, according to Cyprus, the book value of Old Rome's assets for purposes of the Agreement was $16,832,342 (net worth) less $35,836, or $16,796,506, and the excess consideration that Alcoa paid for Old Rome over book value should be determined by subtracting $16,796,506 from $28,551,290, the total consideration. Thus, the excess consideration, as Cyprus would have it determined, was $11,754,784. Amortization of $11,754,784, the excess consideration, from March 31, 1959, to October 31, 1967, at the rate of $1,000,000 per year, is $8,583,333. Therefore, Cyprus by using March 31, 1959, as the valuation date, contends that the result of $3,171,451 is the unamortized excess consideration due Alcoa

16. Subsequent to the closing $114,164 was delivered to Alcoa, the total expenses being $35,836.

pursuant to paragraph 2(a), and the proper amount to be added to the book value of Old Rome's plant and equipment as of October 31, 1967.

In order to determine what the parties intended, it is necessary to look to the contract language. In our opinion, in using March 31, 1959, as the valuation date, Cyprus has correctly interpreted the contract. It is clear from paragraph 2(a) that "the consideration paid by Alcoa in 1959 to the former Rome Cable Company [Old Rome]" means the actual amount, i.e., $28,-551,290, paid by way of stock transfer which took place on March 31, 1959. Therefore, March 31, 1959 is the date for the valuation of the stock, and "the amount by which" that consideration of $28,551,290 "exceeded the book value of [Old Rome's] said assets" is the excess which should be included in "Adjusted Book Value".

Thus, subtracting $16,832,342 (book value) from $28,551,290 (the total consideration) results in excess consideration of $11,718,948, which, when amortized as of the closing date at the rate of $1,000,000 per year, is $8,583,333, the difference being the unamortized excess consideration in the amount of $3,-135,615. Therefore, the amount to be added to the book value of Old Rome's land, plant and equipment as of October 31, 1967, is $3,135,615, instead of $5,-061,667, as representing the unamortized consideration due Alcoa pursuant to paragraph 2(a), which figure would reduce the purchase price $1,926,052.

We find the figure $12,718,000 contained in the last sentence of paragraph 2(a) to be inaccurate in that it is based on the January 22nd valuation date instead of March 31, 1959, the date when the consideration for Old Rome was paid.

There is nothing in paragraph 2(a) which provides that Old Rome may retain $150,000 for expenses with remainder to be subsequently delivered to Alcoa. Therefore, the fact that Old Rome did retain $150,000 and some time after March 31st delivered $114,164 to Alcoa had no effect whatsoever on Old Rome's net worth or book value as of March 31, 1959. The adjustment contemplated reflects the excess of the Alcoa consideration paid in 1959 over Old Rome's book value which, the parties have stipulated, was $16,832,342.

If paragraph 2(a) had provided that the "adjustment" for the excess consideration was to be in the amount *agreed to be paid Old Rome by Alcoa on January 22, 1959*, then $13,645,078 would have been the excess consideration to amortize, and $5,061,667 would have been the unamortized excess consideration. But the parties did not so agree.

Moreover, we think Alcoa warranted the accuracy of the amortized excess consideration. Paragraph 4 of the Sales Agreement contemplated that "a balance sheet and related information as of the Closing Date * * *" would be furnished. In paragraph 8(d) Alcoa warranted that "the balance sheet as of the Closing Date to be utilized pursuant to Paragraph 4 above will accurately reflect Seller's [Rome's] assets and liabilities on that date in conformity with generally accepted accounting principles applied on a consistent basis."

It seems clear that paragraph 2(a) incorporated amortized excess consideration into book value, thus making it an asset covered by the warranty. It provided that the "book value" of Rome's assets, i.e., land, plant and equipment, was "subject to adjustment" by including in "Adjusted Book Value" on the "Closing Date" the amortized excess consideration. The figure Cyprus was to pay as amortized excess consideration was to be included in the book value of the specified assets and was warranted to be accurate. The failure of Alcoa to include it in the balance sheet attached to the invoice (DX 162) is immaterial.

The trial balance sheet of Old Rome as of March 31, 1959, set forth as an asset Alcoa's then calculation of "Excess acquisition cost", $13,563,317 (DX 45). Cyprus intended that the "exact fig-

ures" making up the total purchase price should be "established by audit as of date of closing under the purchase formula established by the United States District Court * * *" (PX 85, p. 2). Mr. Hickman of Alcoa indicated that the amortized excess consideration should have appeared on the balance sheet contemplated by the 8(d) warranty (Tr., pp. 633–635). The figure for land, plant and equipment as adjusted for amortized excess consideration should have been included in the balance sheet attached to Alcoa's invoice of December 12, 1967 and was warranted to be accurate.

It is concluded, then, that the figure $12,718,000 set forth in the last sentence of paragraph 2(a) was an incorrect statement of the value of the land, plant and equipment of Rome as adjusted, because an inaccurate amount for excess consideration was included therein.

With respect to this dispute, the balance of the purchase price of $3,584,847 (PX 422) owed by Cyprus should be reduced by the sum of $1,926,052 leaving a remainder of $1,658,795.

Alcoa contends that the final sentence in paragraph 2(a): "The valuation of land, plant and equipment on this basis on June 30, 1967 was $12,718,000", is an agreement which forecloses inquiry into the accuracy of its unamortized excess consideration calculation. We disagree.

If the parties had wished to "agree upon" a specific figure, they knew how to do so. For example, in paragraph 2(d), the value of one asset was so specifically agreed upon; paragraph 2(d) reads:

"The 530 shares of American Synthetic Rubber Company now owned by Seller shall be valued at $200,000."

The formula price stated in paragraphs 2(a), 2(b), 2(c), 2(e) and 2(f) is in flat contradiction to the agreed fixed value specified in paragraph 2(d). Mr. Hickman carefully explained with respect to this asset that "the price of this asset be pegged at $200,000 * * *" (PX 108, p. 7). He did no such thing regarding the excess consideration formula, despite his testimony that the $12,718,000 figure was an arbitrary one and not subject to question by Cyprus (Tr., pp. 640–641).[17] Mr. Hickman's testimony that this figure established a "benchmark" was not effective since he did not tell Cyprus anything about the benchmark purpose. Interpretation of paragraph 2(a) in the light of the circumstances cannot support Alcoa's construction of the last sentence as a benchmark.

It must be conceded, however, that the last sentence has severely clouded the meaning of paragraph 2(a) as interpreted by the court. The powerful and extensive arguments on each side attest to the confusion thus created. It certainly gives rise to arguments of equitable and collateral estoppel advanced by Alcoa, as well as the warranty argument under paragraph 8(d) advanced by Cyprus.

### Equitable Estoppel

The method and amount by which the excess consideration had been calculated by Alcoa had been presented in the divestiture hearing, and the unamortized amount of such excess consideration as of December 31, 1964, had been included by Judge Brennan in the amount of adjusted book value as of the date set forth in the Final Judgment. Without doubt, Cyprus had the knowledge or the means of knowledge of the method and amount so calculated prior to August 25, 1967 when it executed the Sales Agreement. (Tr., pp. 3097–3098, 3106, 3107, 3125, DX 108; PX 419; PX 415; PX 79, p. 4; PX 85, pp. 36, 37; PX 413 sent to Cyprus; PX 414.) The April 30, 1967 calculation (DX 108) specifical-

17. Prior to the execution of the Sales Agreement, in its negotiations to sell the assets of Old Rome, Alcoa had bargained with prospective purchasers other than Cyprus in effect for a fixed or pegged figure regarding the land, plant and equipment as adjusted by the unamortized excess consideration (PX 45) or a pegged total purchase price (PX 47, PX 48).

ly disclosed $5,562,000 as "unamortized purchase premium".

In view of Cyprus' knowledge and means of knowledge of the method and calculation of excess consideration, and in view of its knowledge that Alcoa consistently used January 22, 1959 as the valuation date, Alcoa contends Cyprus is equitably estopped from questioning the invoice fixing unamortized excess consideration at $5,061,667. In our opinion the facts do not add up to equitable estoppel. Both parties rely on Northwestern Nat. Bank v. Commonwealth, 345 Pa. 192, 27 A.2d 20 (1942), in which the applicable law is set out at page 23:

> "Equitable 'estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts. In this situation, the person inducing the belief in the existence of a certain state of facts is estopped to deny that the state of facts does in truth exist, aver a different or contrary state of facts as existing at the same time, or deny or repudiate his acts, conduct, or statements.' 31 C.J.S. Estoppel § 59, p. 237. Howe [to Use of Commercial Loan and Finance Corp.] v. Mimm, 105 Pa.Super. 474, 161 A. 603, 605.

> "The following principles must be considered in applying the doctrine of equitable estoppel: '* * * in the absence of expressly proved fraud, there can be no estoppel based on the acts or conduct of the party sought to be estopped, where they are as consistent with honest purpose and with absence of negligence as with their opposites.' 31 C.J.S. Estoppel § 69, p. 261. 'There can be no equitable estoppel where the complainant's act appears to be rather the result of his own will or judgment than the product

of what defendant did or represented. The act must be induced by, and be the immediate or proximate result of, the conduct or representation, which must be such as the party claiming the estoppel had a right to rely on. The representation or conduct must of itself have been sufficient to warrant the action of the party claiming the estoppel. If notwithstanding such representation or conduct he was still obliged to inquire for the existence of other facts and to rely on them also to sustain the course of action adopted, he cannot claim that the conduct of the other party was the cause of his action and no estoppel will arise.' 31 C.J.S. Estoppel § 71, p. 269. 'Where there is no concealment, misrepresentation, or other inequitable conduct by the other party, a party may not properly claim that an estoppel arises in his favor from his own omission or mistake.' 31 C.J.S. Estoppel § 75, p. 282. 'Estoppel cannot be predicated on errors of judgment by person asking its benefit.' Grand Central Public Market v. United States, D.C.Cal., 22 F.Supp. 119, 120, appeal dismissed United States v. Grand Central Public Market, 9 Cir., 98 F.2d 1023."

Cyprus did not induce Alcoa to believe certain facts to exist which Cyprus now attempts to deny. All pertinent facts were known to Alcoa to a greater extent than to Cyprus.

Alcoa also knew that the valuation date for the stock which it paid to Old Rome might reasonably be March 31, 1959. On December 30, 1964, J. H. Healy, an Alcoa Vice-President who had been assigned to Rome during part of the time that Rome was owned by Alcoa, and who, as Secretary-Treasurer of Rome had primary responsibility for financial accounting-type matters, considered the valuation date of Alcoa's original investment in Old Rome to be March 31, 1959 (DX 58), but Alcoa by its Comptroller, E. A. Vaughn, and General Counsel, W. K. Unverzagt, decided to use the January 22, 1959 valuation date (DX 59), as was done in the invoice

(PX 162). Since Alcoa was aware of this difference of opinion in its own ranks, one would think it would have insisted upon contract language "pegging" unamortized excess consideration as was done with other prospective buyers (see f.n. 17, *supra*, and accompanying text), but it did not do so. This seemingly intentional omission by Alcoa cannot now be laid at Cyprus' door.

There was no expressly proved fraud on the part of Cyprus. Nor was there any intentional or negligent failure by Cyprus during the negotiations to apprise Alcoa of the discrepancy between its calculation and the Cyprus calculation.

Moreover, Cyprus personnel intended at all times that the component price calculations would be subject to audit; their expectation that the unamortized excess consideration portion of the purchase price would be subject to audit was shared by Mr. Hickman, Alcoa's negotiator (Tr., p. 634; PX 110, paragraph 8(d)).

It is our opinion that Alcoa's equitable estoppel argument is not supported by the facts since its acts appear "to be rather the result of his [its] own will or judgment than the product of what defendant [Cyprus] did or represented."

### Collateral Estoppel

Alcoa next contends that Cyprus is collaterally estopped by virtue of Judge Brennan's Final Judgment providing for divestiture (PX 36) which contained a statement that Rome's adjusted book value as of December 31, 1964 was $16,238,000, from relitigating the issue of unamortized excess consideration.[18]

Although Cyprus was not a party to the anti-trust action, it cooperated through its counsel and officers with Alcoa in securing approval by the Justice Department of the sale of Rome to Cyprus, and it reviewed a draft of the proposed petition for Court approval of the sale. In the Sales Agreement it agreed to cooperate with Alcoa in obtaining Court approval (PX 110, paragraph 16; PX 116; Stipulation of February 13, 1970, paragraphs 28, 29, 30; Requests for Admission, Tr. pp. 2896–2897; Interrogatory, Tr., p. 2918).

At the hearing on Alcoa's petition for approval held October 25, 1967, Cyprus' general counsel, Mr. Kelly, appeared as a "spectator" and Cyprus' top personnel testified in support of the petition (PX 130, pp. 3, 12, 23). The Order approving the sale to Cyprus contained the statement that "the proposed sale of Rome Plants to Cyprus Mines Corporation [is] * * * in accordance * * * with the Final Judgment herein * * *" (PX 131).

As stated in Roth v. McAllister Bros., Inc., 316 F.2d 143, 145 (2d Cir. 1963):

" * * * [C]ollateral estoppel arises when a material fact in any litigation has been determined in a former suit between the parties with whom the parties to the subsequent suit are in privity, *provided that the fact in common was also material to the issue in the previous suit.*" (Emphasis supplied.)

Cf. Restatement, Judgments, §§ 82, 84, Comment e.

Rome's adjusted book value as of December 31, 1964 and the value of that part of adjusted book value representing unamortized excess consideration were not facts material to the issue in the anti-trust action in the Northern District of New York. There is no evidence that any party to the Alcoa anti-trust case ever contended that the adjustment on Rome's books to include the unamortized excess consideration should be computed on any basis other than that used consistently by Alcoa. Even had there been such a contention, an issue so

---

18. The figure of $16,238,000 set forth as adjusted book value of Old Rome's land, plant and equipment consisted of the book value of Old Rome's land, plant, and equipment, plus the excess consideration as calculated by Alcoa, less amortization to December 31, 1964 at the rate of $1,000,000 per year.

raised would not have been a material issue in the anti-trust case.

 Cyprus was neither interested in nor present at the proceedings in 1965 and 1966 when the terms of the divestiture decree were being considered by the District Court. Cyprus' presence at the October 25, 1967 hearing to obtain Court approval of the sale was not sufficient to make any factual determinations in the anti-trust case binding upon it. Cyprus was not in control nor did it have the right to control the terms of the divestiture decree or the approval hearing of October 25, 1967. Upon these facts it is concluded that Alcoa's collateral estoppel contention cannot be sustained. Cf. 1B Moore's Federal Practice and Procedure, ¶ 0.411[6].

*The Adjustment to Overhead Burden Which was Used in Valuing Rome's Inventories as of October 31, 1967*

In 1963 Alcoa personnel at Rome began including certain of Rome's indirect costs, such as power costs, in its inventory valuations on the machine-hour basis. The machine-hour basis is a system under which a portion of each indirect cost is attributed to each machine in a plant in accordance with the amount of that cost which results from the operation of the machine. In turn a portion of the hourly amount of indirect costs attributed to a machine is assigned to each inventory item which has been processed by the particular machine. The result of this procedure is one type of "burden rate". The addition of burden to an inventory increases the book value of the inventory.

Between 1963 and October 31, 1967, several attempts were made to revise Rome's burden rates in the light of new and increased indirect costs which were not applied in the 1963 burden rates, but these attempts were abandoned. As a result, Rome's December 31, 1966 balance sheet did not reflect all the inventory valuation which could have been stated had up-to-date burden rates been in effect. On the closing date, Alcoa revised the burden rates by applying all its current costs to the inventory in the same percentages as were applicable under the previous burden rates.

The result of this change in burden rates by Alcoa was a $319,275 increase in the book value of Rome's inventory as stated on the October 31, 1967 balance sheet prescribed in paragraph 4 of the Sales Agreement (see Stipulation of September 4, 1970).

By paragraph 8(d) Alcoa warranted that this balance sheet would accurately reflect Rome's assets "in conformity with generally accepted accounting principles applied on a consistent basis."

 The change in burden rates was the result of a change from the machine-hour basis to the departmental averaging basis. Although the use of either basis is in conformity with generally accepted accounting principles, the change to the departmental averaging basis was inconsistent with the prior basis for computing burden, and the discrepancy created by this change was a material one. As a result of this change, Alcoa violated paragraph 8(d) of the Sales Agreement, and Cyprus is entitled to an adjustment in the amount of $319,275.

With respect to this dispute, the balance of the purchase price of $1,658,795 owed by Cyprus should be reduced by the sum of $319,275, leaving a remainder of $1,339,520.

*The Inclusion In The Expensed Items Inventory of Items Other Than Eleven Specified Categories Of Items.*

Alcoa wanted to be paid for various spare parts which had been treated on Rome's accounts as expenses and therefore would not be reflected as assets on Rome's balance sheet. Consequently, David J. Mahrer, Assistant Comptroller of Alcoa, wrote the following letter dated October 6, 1967, to Patrick J. McLean, Comptroller of Cyprus:

" 'With respect to expensed materials we propose to physically inventory those categories of material which

comprise the largest dollar value and also physically inventory those categories which have a lesser dollar value, but which can be physically inventoried without a disproportionate expenditure of time and effort. We propose to exclude from the valuation of expensed materials any spare parts or other items which have been used.

" * * *

"The remaining materials consisting of those items of new spare parts and supplies having a relatively small dollar value or requiring an excessively large expenditure of time and effort to physically inventory would have a value established through estimates made by knowledgeable people obtained by the purchasing department.

"The items which we would propose to physically inventory in accordance with the above proposal would be *bearings and pillow blocks, metallic hose, electrical items, power transmission beltings, valves 2" and larger, steel rounds, flats, squares and angles, mechanical tubing, brass rounds, squares and flats, aluminum structural shapes and plate, cutting tools ½" and larger, and band saw blades.*
* * *

"* * * I therefore recommend that the statement in the agreement referring to these expensed materials be modified to provide that we will physically inventory those categories of material which comprise the largest dollar value, and also physically inventory those categories which have a lesser dollar value but which can be physically inventoried without an excessive expenditure of time and effort; and that the items thus physically inventoried will be priced at current market value. The remaining materials will have a value estimated by outside personnel acceptable to both buyer and seller. The items to be estimated would include plumbing fittings and valves less than 2", fasteners of all description, packing materials relating to plumbing and abra-

sives. * * *' " (Emphasis supplied.) (PX 138.)

The deposition testimony of Patrick J. McLean, Comptroller of Cyprus, does not indicate that he attached any significance to the 11 categories of expensed spare parts and supplies set out in this letter (Tr. pp. 2280–2284).

On October 19, 1967, Mr. Unverzagt, General Counsel for Alcoa, wrote to Mr. Kelly, General Counsel for Cyprus:

"In his letter of October 6, 1967 to Mr. P. J. McLean Mr. Mahrer proposed alternative ways of determining value of certain repair parts and other items which had been charged to expense at the time of their purchase in accordance with Rome's standard accounting procedure. The one alternative was to agree now on a lump sum valuation and the other alternative was to physically inventory those items which comprise the largest dollar value as well as those having lesser dollar value but which could be physically inventoried without a disproportionate expenditure of time and effort, all as more fully described in the October 6 letter." (PX 140.)

At a meeting on October 25, 1967, among Messrs. Mudd and Kelly of Cyprus and Messrs. Hickman and Unverzagt of Alcoa, there was a discussion of whether the purchase price which Cyprus was to pay for the assets and business of Rome should include an amount for the expensed items on hand at the Rome plants. Mr. Mudd agreed that since Cyprus would be receiving these expensed items as part of the Rome assets, Cyprus should pay fair value for them. Mr. Mudd and Mr. Hickman agreed that the expensed items would be physically inventoried and their value included in the purchase price, except for those items having small dollar value and which would require a disproportionate expenditure of time to inventory. Mr. Mudd and Mr. Hickman instructed counselors Kelly and Unverzagt to reduce to writing this agreement which had been reached between Mr. Mudd and

Mr. Hickman. There was no reference made at this meeting on October 25th, to the 11 categories of expensed items which were set out in Mr. Mahrer's October 6th letter. Mr. Kelly did not understand on October 25, 1967, that the spare parts and supplies for which Cyprus was to be charged were limited to these 11 categories; nor had he discussed such a limitation with Comptroller McLean. He understood from the October 25, 1967 discussion that items such as paper clips were of the type which would be excluded from the physical inventory.

On October 26, 1967, Mr. Kelly and Mr. Unverzagt spoke on the telephone regarding the wording to be used in connection with the anticipated supplemental agreement on expensed items. Although the general principles of the October 6th letter were discussed, there was no mention of 11 categories. At the closing on October 31, 1967, Mr. Kelly and Mr. Unverzagt executed a Letter Agreement of that date which had been drafted by Mr. Kelly and which provided in paragraph 2 that:

"Rome has repair parts and other inventory items on hand which were charged to expense at the time of purchase in accordance with Rome's standard accounting procedure. It is the intent of the parties to physically inventory those categories of material which comprise the largest dollar value and also those categories which have a lesser dollar value which can be physically inventoried without a disproportionate expenditure of time and effort. * * * The remaining materials, consisting of new spare parts and supplies having a relatively small dollar value or requiring an excessively large expenditure of time and effort to physically inventory, will have no value assigned to them in the determination of the sales price." (PX 146.)

At that time Mr. Kelly did not understand that the inventory would be limited to the 11 categories.

An inventory of Rome's expensed spare parts and supplies was commenced under Alcoa's supervision, and on its invoice Alcoa included amounts of money attributable to expensed spare parts and supplies which are not within the 11 categories mentioned in Mr. Mahrer's October 6, 1967 letter. Had the parties intended that the expensed items to be physically inventoried be limited to the 11 categories, we think that in the circumstances they would have spoken up and incorporated such a limitation into the Letter Agreement. The absence of evidence of any such conduct by the parties is convincing that no limitation was intended and that the Letter Agreement contains no implied limitation to the 11 categories set out above.

■ It has been stipulated that if "said inventory should *not* have been limited to the eleven categories of items listed in [Mr. Mahrer's letter] * * * then the defendant's counterclaim relating to the inventory of expensed items shall be dismissed", and if "the inventory of expensed items should have been [so] limited * * * then defendant's counterclaim relating to such expensed items shall be allowed in the amount of $111,000." (See Stipulation of June 24, 1970; Tr., pp. 3573–3576.) Thus, the only issue presented is one of interpreting the Letter Agreement of counsel in the light of the circumstances of its execution. In our opinion the inventory of expensed items should not have been limited to the 11 categories.

It seems irrefutable that the language in the Letter Agreement of counsel (PX 146) was derived from Mr. Mahrer's October 6th letter. At the time of its writing, Mr. Mahrer anticipated that, if a physical inventory were made, only 11 categories would be included. He also anticipated that the values of some items which would not be inventoried would be paid by Cyprus. Thereafter, despite Mr. Unverzagt's October 19th reference to the "more fully described" categories of items "in the October 6 letter" (PX 140) no Cyprus personnel had an understanding that the expensed items to

be inventoried were to be limited to the 11 categories. We are satisfied that all persons concerned intended on October 25th, when an agreement on the expensed items was reached, and on October 31st, when that agreement was executed, that the general language employed in the Letter Agreement (PX 146) should be a guide to the physical inventory, and that there was no intent that the inventory be limited to the 11 categories mentioned in Mr. Mahrer's letter of several weeks earlier.

Both counselors, Kelly and Unverzagt, had knowledge of Mahrer's October 6th letter. McLean knew of the 11 categories of expensed items, but at no time did he discuss them with Kelly.

Cyprus is not entitled to an adjustment for the $111,000 valuation of expensed items which do not fit in the 11 categories.

The balance of the purchase price of $1,339,520 owed by Cyprus should not be reduced with respect to this dispute.

### The Book Value of Rome's Land and Plant At Collegeville, Pennsylvania.

Rome owned land and a plant at Collegeville, Pennsylvania, which, pursuant to the Sales Agreement, were assets to be transferred to Cyprus. Since 1964 the Collegeville facilities had not been used actively in the operation of Rome's business. A portion of these facilities was used for storage and another portion was leased to a third party. These facilities were carried on Rome's books at $158,000 representing cost less depreciation (see Stipulation of May 12, 1970, paragraphs 1, 2, 3, 4).

The December 12, 1967 invoice (PX 162) demanded payment from Cyprus under the balance sheet in Exhibit I based on the inclusion in land, plant and equipment under paragraph 2(a) of the Sales Agreement of the unused Collegeville facilities at their cost less depreciation of $158,000.

On October 31, 1967, these facilities were being held and had not been sold only by reason of Alcoa's construction of the divestiture decree (DX 31; DX 32).

■ A generally accepted accounting principle requires that such idle facilities be valued on the books at their estimated realizable value rather than at cost less accumulated depreciation, especially when the basic purpose of the financial statement being rendered is to establish the amount of money that is going to be changing hands between a buyer and a seller.[19] The estimated realizable value of the idle facilities at Collegeville was $80,000 (see stipulation, March 20, 1970, paragraph 15). The difference between cost less depreciation and the realizable value of these facilities is $78,000.

Alcoa contends that this difference is not material when compared to the net cost of land, plant and equipment and to the total assets of Rome (Tr., p. 1426). It is our opinion, however, that materiality must be determined with reference to the purpose for which the balance sheet is prepared. In this case it was prepared for the purpose of fixing portions of the purchase price Cyprus was to pay for Rome. Viewed in this context we think $78,000 is material to the portion here involved, i. e., $158,000.

■ The valuation of the Collegeville facilities, placed by Alcoa on the October 31, 1967 balance sheet, was not in "conformity with generally accepted accounting principles applied on a consistent basis" as was required by paragraph 8(d) of the Sales Agreement. These assets should have been written down to $80,000.

With respect to this dispute, the balance of the purchase price of $1,339,520 owed by Cyprus should be reduced by the sum of $78,000, leaving a remainder of $1,261,520.

Judgment should be entered in favor of Emor and against Cyprus in the sum of $1,230,356 and in favor of Delcalo and against Cyprus in the sum of $31,-

19. Tr., p. 3841, excluding the stricken answer at pp. 3841–3842; Tr., pp. 3851, 3871–3872; see also Tr., pp. 1424–1425.

164, with interest from October 31, 1967.

This opinion shall be deemed to embody findings of fact and conclusions of law required by Rule 52, Fed.R.Civ.P., 28 U.S.C.A.

An appropriate order will be entered.

## OPINION AND ORDER ON MOTION TO ALTER OR AMEND

Pursuant to Rule 59(e), Fed.R.Civ.P., the plaintiffs and counterdefendants moved to alter or amend the judgment entered on December 1, 1970, and increase same by $1,398,527. Oral argument was held as requested and the briefs of the parties in support of and against the motion were considered. It is the opinion of the court that the motion should be denied.

The movants contend that if the consideration paid by Alcoa for the assets of Old Rome in 1959 was $28,551,290 and that the amount of excess consideration was $11,718,948, a mathematical error was committed by the court in amortizing the excess consideration so found at the rate of $1,000,000 per year for a period of 11.7 years. The position of the movants is that the excess consideration should be amortized for a period of 14 years; that the mathematically correct procedure would require dividing the excess of $11,718,948 by 14 and the quotient of $837,068 is the accurate rate of amortization per year instead of $1,-000,000. Thus, the movants contend that the unamortized excess consideration as of October 31, 1967 should be $4,534,142 instead of $3,135,615 as found by the court, and the judgment in favor of the plaintiffs should be increased by $1,398,527.

The short answer is that the formula[1] agreed upon by the parties in paragraph 2(a) stipulated that the excess consideration paid by Alcoa "has been and is being amortized at the rate of a million dollars per year."

The court found that March 31, 1959 was the date on which Alcoa paid for the assets of Old Rome, and that the warranted figure of $11,718,948 was the excess consideration (see Opinion, p. 947). Although movants must have realized that under the evidence the court might have so found, they never advocated that in such event the excess of $11,718,948 should be amortized over a period of 14 years. The court did not consciously amortize the excess consideration at the rate of $1,000,000 per year "over a period of 11.7 years", as contended by movants, for the simple reason that such instruction was not contained in the formula.

The amount of unamortized excess consideration was the only disputed issue to arise out of paragraph 2(a). See: Pretrial Stipulation (February 13, 1970), III, 16A, p. 5.[2] It was never suggested at pretrial or at trial that either a period of amortization or the rate of amortization, or both, were of any concern to the movants regardless of the finding as to excess consideration. It seemed clear that whatever figure the excess consideration was determined to be, that the parties had agreed and understood, and the formula was so interpreted by the court, that the excess should be amortized at the rate of $1,-000,000 per year, i. e., from March 31, 1959 to October 31, 1967. See: Defendant's post-trial Proposed Findings of Fact (received July 23, 1970), Findings 21 and 26, wherein Cyprus spelled out

1. Alcoa emphasized that the selling price of Rome and particularly the land, plant and equipment was fixed by formula set forth in paragraph 2 of the Sales Agreement. See: Plaintiffs' and Counterdefendants' Brief (received July 29, 1970), pp. 2, 3, 137, 138, 139; Plaintiffs' and Counterdefendants' Proposed Findings of Fact (re-

ceived March 20, 1970), section II, Finding 18.

2. Pretrial Stipulation, III, 16:
 " * * * There are six items in dispute:
 "A. The unamortized amount of the excess consideration paid by Alcoa for the assets and business of Old Rome in 1959."
 The remaining five disputed items do not concern paragraph 2(a).

its contention that $1,000,000 per year was the correct amortization rate. Movants' later Proposed Findings of Facts and Brief failed to question the propriety of the $1,000,000 amortization rate as contended by Cyprus.[3]

Movants contend that:

"The entire agreement of the parties with respect to valuation of land, plant and equipment for inclusion in the purchase price, is set forth in Paragraph 2(a) of the Sales Agreement."[4] The formula set forth in that paragraph does not specify a period of amortization; it did not specify that the expected useful life of the acquired assets should be 13 years, or 13.6 years, or 14 years, or 11.7 years, although the parties might have specified and selected any one of those figures, and they might have omitted amortization altogether. It seemed clear to the court that the amortization rate had been agreed upon at $1,000,000 per year, and that was the rate to be applied to the excess consideration. Thus, from March 31, 1959 to October 31, 1967, eight years and seven months, the excess of $11,718,948 would be reduced by $8,583,333, resulting in unamortized excess consideration of $3,135,615.

■ It is true that in 1959, for a brief period of months after Alcoa purchased Old Rome, it did use 14 years as the period of amortization at the rate of $1,000,000 per year before its book entries were reversed in favor of the "pooling of interest" theory.[5] No doubt these historical facts influenced the negotiators for Alcoa in 1967 to suggest the $1,000,000 amortization rate when the formula in paragraph 2(a) was being prepared. However, in the absence of ambiguity, fraud, accident, duress or mistake, and none has ever been alleged, such parol evidence cannot contradict or vary the plain terms of the formula as written. Gianni v. Russell & Co., Inc., 281 Pa. 320, 126 A. 791.

Without doubt Alcoa believed, and probably still does, that $13,645,078 was the excess consideration it paid for Old Rome's assets, and that was the figure to be amortized at the $1,000,000 per year rate. As stated, the court found that the warranted figure of excess consideration was $11,718,948, and applied to that figure the agreed rate of amortization. We think that the only area of possible error is the amount of excess consideration, not the rate of amortization.

■ To agree now with Alcoa's position, the court would be rewriting the formula for the parties by substituting the following in paragraph 2(a): "* * which excess has been and is being amortized at the rate of $837,068 per year over a period of 14 years." Ordinarily a court cannot rewrite the contract for the parties even though it may believe a fairer result would be obtained. Fischer & Porter Co. v. Porter, 364 Pa. 495, 502, 72 A.2d 98, 102; Hagarty v. Wm. Akers, Jr., Co., Inc., 342 Pa. 236, 239, 20 A.2d 317, 319; Fleck-Atlantic Co. v. Insurance Co., 326 Pa. 15, 25, 191 A. 51, 56; Moore v. Stevens Coal Co., 315 Pa. 564, 568, 173 A. 661, 662; Williston on Contracts, Third Edition Section 620, pp. 757–758.

An appropriate order will be entered.

---

3. See Plaintiffs' and Counterdefendants' Proposed Findings of Facts and Conclusions of Law (received July 29, 1970), Finding 189(h); Plaintiffs' and Counterdefendants' Brief (received July 29, 1970), pp. 120, 124, 129, 131(a)–132.

4. Plaintiffs' and Counterdefendants' Proposed Findings of Fact (received March 20, 1970), Finding 108, p. 48.

5. Tr., vol. 28, pp. 4051, 4052.