**STATE MUT. LIFE ASSUR. CO. OF WORCESTER, MASS., v. SCHULTZ et al.**

No. 9395.

Circuit Court of Appeals, Ninth Circuit.

May 11, 1940.

Robert R. Rankin, of Portland, Or. (Wood, Matthiessen & Rankin, of Portland, Or., of counsel), for appellant.

Wilson S. Wiley, of Klamath Falls, Or., and Ralph H. King and Borden Wood, both of Portland, Or. (McCamant, Thompson, King & Wood, of Portland, Or., of counsel), for appellees.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HANEY, Circuit Judge.

Appellees recovered judgment against appellant on an insurance contract issued by appellant on the life of one Lundell, in which appellees were named as beneficiaries.

A tonsillectomy was performed on deceased on May 12, 1928.

By an agreement effective September 15, 1936, appellant employed one Eller "for the purpose of canvassing for applications for insurance and annuity contracts in [appellant company] on the lives of persons who shall be satisfactory to the said Company, and for the purpose of collecting and paying over premiums on such insurance and annuity contracts when effected."

On January 4, 1937, appellees and Lundell, the deceased, entered into an agreement organizing a partnership to be known as the Klamath Moulding Company to exist for 15 years. The agreement provided that each of the partners would insure his life, naming the other partners as beneficiary. Subsequently it was agreed that appellee Schultz would obtain a policy for $10,000; that deceased would obtain a policy for $10,000; and appellee Sayre would obtain a policy for $5,000.

Dr. Merryman testified that about the middle of May, 1937, he examined deceased, found that deceased had an enlarged heart with murmurs, found that a urine test showed positive albumin, "four plus", and that he told deceased that in his opinion deceased was uninsurable. Appellee Sayre testified that about that time "Eller asked me if I knew that [deceased] had not passed his examination and I told him I did not, and Eller said he was going to have [deceased] examined again. Eller said the reason [deceased] was turned down was because he had a bad heart". Appellee Schultz testified to the same effect and that Eller further said "I don't believe what Merryman said" and "I'm going to send him up to Dr. Hunt". Eller denied both conversations.

The application consisted of two parts. The answers to the questions in the first part were written by Eller on May 29, 1937. Dr. Hunt testified that Eller made arrangements with him to examine deceased, and that Eller left the application at Dr. Hunt's office after he had filled in the first part of the application. Eller's testimony was in conflict with that of Dr. Hunt on these matters. Dr. Hunt also testified that he examined deceased on May 30, 1937 and found no trace of albumin or evidence of heart disease or heart murmers. Part II of the application consisted of statements made to Dr. Hunt who wrote them in accordance with the information given him by deceased, and which included the following:

"22. Has any medical examiner or physician ever expressed an unfavorable opinion as to your insurability or health? If so, give full particulars.—No * * *

"31. For what illness, disease or injury did you last consult a physician or practitioner?—None.

"32. What illnesses, diseases or accidents have you had in the last five years?—None * * *

"33. Have you had any of the following diseases: * * *

"(g) * * * disease of heart or blood vessels * * * liver * * * kidney * * * ?—No * * *

"36. Have you ever been an inmate of any hospital or sanitarium for treatment, observation or diagnosis?—No * * *

"38 (a). Has your urine ever shown albumin?—No * * *

"39. Have You Ever sought advice or treatment of a physician or practitioner for any injury or local or general disease not already mentioned?—No * * *"

Following the questions in the application was the following: "It Is Understood and Agreed: (1) That I have read all the statements and answers in Parts I and II of this application, and declare that they have been correctly recorded by the soliciting agent and medical examiner, and that no circumstance or information touching my past and present state of health and habits of life has been withheld or omitted. (2) That no liability shall exist unless and until the policy hereby applied for shall be delivered and the first premium thereon paid during the lifetime and sound health of the applicant * * *"

Part I of the application was signed by deceased and Eller, and Part II of the application was signed by deceased and Dr. Hunt. Dr. Hunt also submitted to appellant his report of the medical examination, which was made on May 30, 1937. It contained, among other things, the following:

"59. The heart should be examined after moderate exercise.

"A. Is there any indication of hypertrophy or disease of the heart?—No * * *

"69. Analysis of Urine * * *

"b. Albumin?—No *. * *

"71. Do you, without reservation, recommend the applicant for the insurance applied for? Answer Yes or No.—Yes."

The policy was delivered in July, 1937. It provided that it would "not take effect until actually delivered and the first premium paid hereon during the lifetime of the insured"; that the first and all subsequent premiums were due and payable at Worcester, Massachusetts, "or to an agent of the Company upon delivery of a receipt for the premium, signed by the President, Vice-President or Secretary, and countersigned by the agent or agency cashier designated thereon"; and that the application was part of the contract.

Dr. Hunt further testified that he prescribed a general tonic for deceased on May 18, 1937, and a tonic and liver stimulant on June 19, 1937; that deceased complained of a back ailment on July 3, 1937 which was diagnosed as lumbago; and that he again prescribed a tonic for deceased on July 17, 1937. A chiropractor treated deceased a total of 31 times between July 24, 1937 and August 28, 1937 "for soreness and tenderness in the upper neck and, secondarily, the disturbance around the hip".

The first premium on deceased's policy was not paid until after deceased had been examined by a medical examiner in August, 1937. On August 21, 1937, a check to appellant's general agent at Portland, Oregon, was delivered to Eller, who gave his receipt therefor and sent it to the general agent. Subsequently but on the same day, appellee Schultz, according to Eller's testimony, told Eller that he (Schultz) believed the deceased "was failing in health." The general agent apparently received the check on August 22, 1937, for he issued a receipt on that date, which contained the following statement: "Any check or draft remitted in settlement is accepted subject to collection." The check was paid by the drawee bank on August 24, 1937.

On August 27, 1937, deceased consulted Dr. Adams, who treated deceased until September 1, 1937. On August 28, deceased was confined to his bed. On September 1, 1937, Dr. Dietsche took control of the case, and deceased was moved to a hospital. On September 5, 1937, Dr. Earhart was called into consultation with Dr. Dietsche, as was Dr. Rush the following day. Death occurred on September 15, 1937 at 7:55 p. m. On the following day Dr. Dietsche and Dr. Earhart made a postmortem report, containing the following:

"Cause of Death:

"Primary: Acute Bilateral Pyelonephritis.

"Contributory: Chronic Myocarditis with Acute Cardiac Failure. Chronic Glomerular Nephritis."

Dr. Dietsche testified: "Pyelonephritis means an inflammation of the pelvis of the kidney and of the joining kidney tissue itself". Dr. Dietsche signed a death certificate stating that the principal cause of death was "Pyelo-nephritis (acute)". He also made an attending physician's statement to the same effect which contained:

"Was the deceased to your knowledge, afflicted with any other disease or affection (sic), acute or chronic?—Yes.

"(1. Chronic disease of heart & kidneys)

"(2. Old injury of the lumbar spine.)"

Appellant declined to pay appellees the amount alleged to be due under the policy. On April 4, 1938, appellees brought this action in a state court in Oregon. It was removed to the court below. The com-

plaint alleged, among other things, that deceased promptly communicated to Eller that Dr. Merryman had told deceased that the latter "had an enlarged and leaky heart". Appellees' theory was that appellant had knowledge of deceased's infirmities, if any, when it issued the policy, and when it received the application, by imputation of Eller's knowledge to it. Appellant's theory was that it did not have knowledge, and that, therefore, recovery should be denied because of false answers in the application.

In addition to the evidence already related, Dr. Earhart testified: "From my postmorten examination of Lundell's body, I did not find any condition which, in my opinion, would have caused him on May 30, 1937, to have been an uninsurable risk, and my answer would be the same as to the date of August 21, 1937". Dr. Dietsche expressed the opinion that deceased's heart and kidney afflictions had existed for at least six months. Dr. Adams opined that deceased was not in sound health in May, 1937, July, 1937 or on August 21, 1937. Dr. Rush opined that the immediate cause of the death was a failing heart; that the heart condition existed for a period of six months or longer, and that it was probable that deceased "had chronic kidney disease over a period of time". Dr. Furrer, who made a microscopic examination of deceased's heart and kidney tissue after death, expressed the view that such organs were diseased in May, 1937, July, 1937 and on August 21, 1937. Appellant's medical director testified that deceased's application would have been denied had he known deceased "was suffering from a disease of the heart or kidneys".

Inasmuch as the instructions deal with an Oregon statute respecting the authority of an insurer's agent, we quote it (Or.Code Ann.1930, § 46-515): "Any person who shall solicit and procure an application for life insurance shall, in all matters relating to such application for insurance and the policy issued in consequence thereof, be regarded as the agent of the company issuing the policy and not the agent of the insured * * *."

The trial court instructed the jury that if they found that deceased was not in sound health at the time of the delivery of the policy and payment of the first premium thereon, and knew it, and appellant through Eller did not know it, then they must return a verdict for appellant.

That instruction was followed by one stating: "* * * In that regard you will first have to consider the matters that I have just related to you, but in particular relation to the soliciting agent, Eller, you must take up his authority and the question of whether this was a matter which related to the application and the policy. And then take into consideration the statement which Eller said was made to him upon the day that the premium was tendered to him and before it had gotten ·in the hands of the General Agent. You will remember the statement which he claimed was made to him in the bedroom by Schultz, one of the plaintiffs, and you will consider whether or not that put the company on notice. You will take into consideration all the surrounding circumstances of that interview."

Appellant's request for two instructions was denied. The jury found for appellees. Judgment was entered on the verdict. This appeal followed.

Appellant contends that the instruction above quoted is erroneous for two reasons, one of which we pass with little comment. It is contended that there was no "tender" of the premium because appellant did not refuse the payment or the check. This contention is hypercritical. It is obvious that the trial court did not use the word "tendered" in a legal sense, but in the non-technical sense of "offered" or "presented for acceptance".

The principal contention is that Eller's agency terminated when he received the check for the premium, and since the statement made by Schultz to Eller occurred after that time, knowledge could not be imputed to appellant. It cannot be doubted, in the absence of an authoritative Oregon decision, that Eller's authority was extensive enough to bind appellant by his knowledge regarding deceased's health, obtained prior to delivery of the policy and payment of the first premium. Stipcich v. Insurance Co., 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895. Compare: Northwestern Mut. Life Ins. Co. v. Cohn Bros., 9 Cir., 102 F.2d 74, 77. In other words, the information here was of a character which Eller, as agent, had authority to receive on behalf of appellant, unless when he received it his agency had ended.

Regarding the purpose of the Oregon statute, it was said in Stipcich v. Insurance Co., supra, 277 U.S. page 321, 48 S.Ct.

page 515, 72 L.Ed. 895: "* * * To say that under this statute the company's agent to solicit and receive the application and deliver the policy is not its agent also to receive disclosures which supplement the application and which vitally affect the validity of the insurance if not disclosed, is to disregard its language and ignore the obvious purpose of such legislation to require the company to provide some agency within the state with which the insured may safely deal in matters relating to his application. ✚* * *"

Thus it is clear that Eller was not unauthorized unless, as it is contended, his authority terminated.

◼ The policy, according to its terms, did not become effective until it was delivered and the first premium was "paid". Appellant's argument is that when the first premium was paid Eller's agency terminated, and no suggestion is made that such agency terminated prior to the payment of the premium. It is necessary, therefore, to determine when such premium was paid. Appellant, while admitting that ordinarily the delivery of a check is not payment until paid by the drawee bank, contends that a check may be, and it was here, accepted as payment. This contention is without support in the evidence. The policy by express terms provides that the first premium was due and payable at Worcester, or to an agent, but only "upon delivery of a receipt * * * countersigned by the agent or agency cashier designated thereon". No such receipt was made until August 22, 1937, and when it was issued, it contained the language that "Any check or draft remitted in settlement is accepted subject to collection". Nothing in the record explains the receipt, or discloses a different intent. The intent, as shown by these documents, was that the premium was paid when the check was paid on August 24, 1937. Appellant's contention that the premium was paid on August 21, 1937 cannot be sustained.

◼ Appellant requested an instruction to the effect that there was no evidence that the deceased communicated the fact of his examination by Dr. Merryman to Eller. The instruction was denied, and we think, correctly denied. The jury might well have believed the testimony of Eller that Dr. Merryman did not inform Eller of his examination until after the death, and at the same time have believed appellees' testimony as to Eller's statements to them which showed that Eller had knowledge of the examination. Under such circumstances the jury could properly infer, and logically, that Eller could have obtained the information from only one source—the deceased. Since there was evidence from which the fact could have been, and we assume was, inferred, it would have been improper to instruct the jury that there was "no" evidence of the fact.

◼ Finally, it is urged that the court improperly refused to give two instructions requested by appellant to the effect that if the jury found that a medical examiner had expressed an unfavorable opinion as to the insurability or health of deceased, then they might find that deceased's answer to question 22 in the application was false. The court below instructed the jury that there were four issues to be decided by them, one of which was whether deceased "in his answers to certain questions had knowledge of his physical condition and whether his answers were material to the risk and false and made with the intent on the part of Lundell to deceive the defendant insurance company into issuing the policy", and "the affirmative claims of defense which I noted as to fraud must be proven by a preponderance of the evidence". Elaborating on the issue of the answers, the court below instructed the jury: "It is incumbent upon the defendant to show by a preponderance of the evidence that in answering the particular questions as he did to Dr. Warren Hunt, a designated examiner, first, that the insured knew that the answer was false or should have known it was false; second that the matter involved in the question and answer was material to the risk; third, that the insured intended to have the insurance company rely thereon; and fourth, that the insurance company did rely thereon".

We think the substance of the requested instructions was sufficiently covered by the instructions given, and that the refusal to give the requested instructions was not erroneous.

. Affirmed.