EMOR, INC., Appellant in No. 71–1671,
and Delcalo, Inc.

v.

CYPRUS MINES CORPORATION,
Appellant in No. 71–1673,

v.

ALUMINUM COMPANY OF AMERICA
(Counterdefendant).

Appeal of DELCALO, INC., in
No. 71–1672.

Nos. 71–1671 to 71–1673.

United States Court of Appeals,
Third Circuit.

Argued June 6, 1972.

Decided Sept. 22, 1972.

Frank L. Seamans, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for Emor, Inc. and Delcalo, Inc.

Bruce A. Bevan, Jr., Musick, Peeler & Garrett, Los Angeles, Cal., for Cyprus Mines Corp.

Before ADAMS, GIBBONS, and MAX ROSENN, Circuit Judges.

## OPINION OF THE COURT

MAX ROSENN, Circuit Judge.

This is an appeal in a diversity contract action from a judgment of the United States District Court for the Western District of Pennsylvania. After a long non-jury trial of 29 days, the trial judge entered judgment in favor of Aluminum Company of America (Alcoa) and against Cyprus Mines Corporation (Cyprus) for $1,261,520. Each party has appealed. All material facts in the case are stated in an exhaustive and thoughtful opinion, Emor, Inc. v. Cyprus Mines Corporation, 325 F.Supp. 931 (W.D.Pa.1970)[1] and do not require reiteration.

The genesis of this case is a Supreme Court decision, United States v. Aluminum Co. of America, 377 U.S. 271, 84 S. Ct. 1283, 12 L.Ed.2d 314 (1964), which held that Alcoa was in violation of the Clayton Act and, as a result, had to divest itself of the assets and business acquired from Rome Cable Corporation (Old Rome). Old Rome had been acquired by Alcoa by negotiations initiated on January 21, 1959, and a closing transaction consummated on March 31, 1959. Pursuant to the directive of the Supreme Court, Alcoa began the process of divestiture of Rome. One of the suitors for acquisition of Rome was Cyprus. It entered into negotiations with Alcoa, and the purchase of Rome by Cyprus was arranged. Pursuant to the negotiations, on August 25, 1967, Cyprus prepared and transmitted to Alcoa executed copies of an agreement of sale. This agreement was executed on behalf of Alcoa on October 2, 1967. The Justice Department did not object to the sale, and on October 25, 1967, the District Court for the Northern District of New York, entered an order approving the sale.

The contracts of sale between Alcoa and Cyprus were executed in Pennsylvania. The closing and actual transfer of assets to Cyprus were concluded in Pittsburgh, Pennsylvania on October 31, 1967. Consonant with the principles we enunciated in Seneca Falls Machine Company v. McBeth, 368 F.2d 915 (3d Cir. 1966), the trial judge concluded that the laws of Pennsylvania applied to the interpretation and application of the

---

1. Emor, Inc. and Delcalo, Inc. are wholly owned subsidiaries of Alcoa, Inc. which guaranteed the performance of the sales agreement discussed later in the body of this opinion. The sales agreement was actually entered into by Emor, Inc., then known as Rome Cable Corp. (Rome) for itself and Delcalo, Inc. who held title to the assets originally acquired from the former Rome Cable Corp. (Old Rome). Emor and Delcalo are Delaware corporations having their principal places of business in Pennsylvania. Cyprus is a New York corporation; Alcoa is a Pennsylvania corporation. We treat Alcoa and its subsidiary corporations, Emor and Delcalo, as "Alcoa." This was the treatment utilized by the district court. Since both Alcoa and Cyprus have points on appeal in this case, we refer to them as "Cyprus" and "Alcoa" respectively instead of using the terms appellant and appellee.

agreements. The parties by stipulation agreed with this conclusion.

These appeals involve the determination of the purchase price to be paid by Cyprus to Alcoa for the assets of Rome. The issues raised on these appeals turn on the interpretation of the sales agreement between them. The first of the issues is a determination of what the parties meant by the reference in paragraph 2(a) of the agreement to "the consideration paid by Alcoa in 1959 to the former Rome Cable Corporation for its assets and business." The second issue is a determination of what the parties meant in paragraph 2(b) of the sales agreement as the price to be paid for the copper content in Rome's inventories on the date of closing.

## I. INTERPRETATION OF PARAGRAPH 2(a).

The sales agreement of October 2, 1967, contained the following paragraph:

2. *Purchase Price of Assets.*

(a) Land, plant and equipment shall be valued at their adjusted book value *on the Closing Date after* allowance for depreciation and amortization, the book value thereof being subject to adjustment resulting from the allocation to said assets and the inclusion in "Adjusted Book Value" of the amount *by which the consideration paid by Alcoa in 1959 to the former Rome Cable Corporation for its assets and business exceeded the book value of said assets*, which excess has been and is being amortized at the rate of a million dollars a year. The valuation of land, plant and equipment on this basis on June 30, 1967, was $12,718,000. (emphasis supplied).

By the terms of this section of the agreement, Cyprus was to pay Alcoa an amount which reflected the excess consideration (as depreciated) paid by Alcoa for Old Rome's assets and business when they were initially purchased in 1959.

Under the 1959 purchase agreement, Alcoa had issued and delivered as payment 355,226 shares of its stock. On January 21, 1959, some three months prior to the completion of the merger between Old Rome and Alcoa, Alcoa wrote to Old Rome and offered to purchase all of its assets and business for 355,226 shares of the common stock of Alcoa. Old Rome's board of directors accepted Alcoa's offer on January 22, 1959, by countersigning Alcoa's offer of January 21. On February 17, 1959, Old Rome and Alcoa entered into a formal plan and agreement. On March 25, 1959, Old Rome's stockholders approved the sale. On March 31, 1959, the transaction was closed and the stock delivered.

The market value of Alcoa's stock on January 22, 1959, was $85.375 per share. On March 31, 1959, the value of a share of Alcoa stock was $80.375. The dates become critical in the determination of "the consideration paid by Alcoa in 1959 to the former Rome Cable Corp. for its assets and business [in excess] of the book value of said assets." (para. 2(a) of 1967 sales agreement quoted above).

Cyprus and Alcoa differed, before the district court, on which date—March 31, 1959, or January 22, 1959—should be used to fix the value of the Alcoa stock delivered to Old Rome. Alcoa argued that its stock should be valued as of January 22, 1959; and Cyprus argued that the valuation should be as of the closing on March 31, 1959. The district court held that the parties, Alcoa and Cyprus, intended March 31, 1959, as the valuation date. We disagree and reverse on this issue.

The district court, believing the language of paragraph 2(a) sufficiently clear, rested its decision upon the words of that section alone. The district court stated:

In order to determine what the parties intended, it is necessary to look to the contract language. In our opinion, in using March 31, 1959, as the valuation date, Cyprus has correctly interpreted

the contract. *It is clear from paragraph 2(a) that 'the consideration paid by Alcoa in 1959 to the former Rome Cable Company [Old Rome]' means the actual amount, i. e. $28,551,290, paid by way of a stock transfer which took place on March 31, 1959. Therefore, March 31, 1959 is the date for the valuation of the stock.* . . . Emor, Inc., supra, 325 F.Supp. at 947. (emphasis supplied). This brief paragraph forms the whole of the district court's reasoning concerning the proper valuation date.

Cyprus argues that the district court explored the circumstances surrounding the formulation of paragraph 2(a). However, where the district court felt it necessary to examine the surrounding circumstances, due to ambiguity in the contract language, it did not hesitate to probe the incidents leading to the sales agreement. For example, on the issue of copper content discussed below, the district court devoted some twelve pages to surrounding circumstances. Additionally, although Cyprus points to several segments of the district court's opinion as indicative of the court's examination of surrounding circumstances, these segments contain discussions made by the district court in reference to other issues before it.[2]

 Since the district court rested its interpretation of paragraph 2(a) not on any demeanor evidence, but on the literal words of the paragraph, we are not bound by the clearly erroneous standard. As Judge Learned Hand noted: ". . . appellate courts have untrammelled power to interpret written documents." Eddy et al. v. Prudence Bonds Corp., 165 F.2d 157, 163 (2d Cir. 1947), cert. denied sub nom, Prudence Realization Corp. v. Eddy et al., 333 U.S. 845, 68 S.Ct. 664, 92 L.Ed. 1128 (1948). *See also*: S. S. Silberblatt, Inc. v. Seaboard Surety Co., 417 F.2d 1043 (8th Cir. 1969); Wooddale, Inc. v. Fidelity and Deposit Co. of Maryland, 378 F.2d 627 (8th Cir. 1967). Moreover, we emphasize that we have no essential difference with the facts as found by the district court. Additionally, we note that the parties themselves differ little as to the essential facts. In these circumstances, this court is free to draw its own inferences as to the significance of the facts as they relate to the construction of paragraph 2(a). Dingman v. United States, 429 F.2d 70, 72 (8th Cir. 1970), and cases cited therein. *See also:* Glassman Construction Co. v. United States for Use and Benefit of Clark-Fontana Paint Co., 421 F.2d 212 (4th Cir. 1970); United States v. Winthrop, 417 F.2d 905 (5th Cir. 1969); American National Bank of Austin v. United States, 421 F.2d 442 (5th Cir. 1970).[3]

2. Thus, Cyprus notes in its brief to this court, that "the court found from reading paragraphs 2(a) and 8(d) together that Alcoa had warranted the accuracy not only of the land, plant and equipment assets of paragraph 2(a) but also the unamortized excess consideration which was to be included in the book value of said assets."

But the district court did not refer to 8(d) in order to clarify the meaning of "excess consideration" as defined in paragraph 2(a). Indeed, the district court, *having found that "excess consideration" was to be adjudged from the March 31 date* concluded that "the figure $12,718,000 contained in the last sentence of paragraph 2(a) [is] inaccurate in that it is based on the January 22nd valuation date instead of March 31, 1959,

the date when the consideration for Old Rome was paid." Emor, Inc. v. Cyprus Mines Corp., 325 F.Supp. 931, 947 (W.D. Pa.1970) (emphasis supplied). Having reached this conclusion, it was necessary for the district court to consider 8(d) in order to decide whether or not the sum of $12,718,000 contained in paragraph 2 (a) could stand although it was based on the January 22 date. Using paragraph 8(d), the district court concluded that "Alcoa warranted the accuracy of the amortized excess consideration." *Id.* Therefore, the district court's reference to paragraph 8(d) was for an altogether different purpose.

3. We treat conservatively in the circumstances of this case, the issue of the ability of the court of appeals to decide is-

The district court's interpretation rested on the phrase "the consideration *paid* by Alcoa in 1959 to the former Rome Cable Company. . . ." (emphasis supplied). It believed this language so strongly fixed March 31, 1959, as the valuation date that the remainder of the paragraph could be disregarded. Apparently, the court felt that "consideration paid" had a direct reference to the date of the physical transfer of the Alcoa stock in payment for the 1959 acquisition of Old Rome. An admission requested by Cyprus, admitted by the court under F.R.Civ.P. 36, and perhaps considered critical by it, was that: "Said consideration was *paid* to Rome on March 31, 1959." (emphasis supplied).

We do not believe that the mere phrase "consideration paid" may in and of itself be construed as a direct reference to the date and act of physically transferring the Alcoa stock to Old Rome. "PAY is a general term, usu. lacking particular connotation. . . ." Webster's Third New International Dictionary, Unabridged, 1659 (1966). Indeed, courts faced with construing the meaning of "paid" have resorted to surrounding circumstances or other terms in the contract. United States v. Cowden Mfg. Co., 312 U.S. 34, 37, 61 S.Ct. 411, 85 L.Ed. 497 (1941); State Mut. Life Assur. Co. v. Schultz, 111 F.2d 1009, 1013 (9th Cir. 1940).

Although standing alone from the rest of paragraph 2(a) "consideration paid" is ambiguous, when read in the total context of paragraph 2(a) the ambiguity is shed. The language of paragraph 2(a), quoted below, defines "excess consideration" in at least three ways:

> . . . *which excess* has been and is being amortized at the rate of a mil-

lion dollars per year. The valuation of land, plant and equipment on this basis on June 30, 1967 was $12,718,000. (emphasis supplied).

First, it is that excess which "has been amortized." An analysis of the facts reveals that the only excess consideration ever amortized is the figure for excess consideration reached by using the January 22nd date: $30,327,420.[4]

Second, it is that excess consideration which, at the time of the contract, "is being amortized at the rate of $1 million per year." Alcoa had initially started to amortize the excess consideration using January 21, 1959, as the date for valuation purposes. While there was some question as to whether it continued to amortize after November 20, 1959 when it changed its accounting treatment of the transaction to a "pooling of interest" principle, Alcoa's Vice President Hickman testified during the *anti-trust action* that they were charging off the 13 million dollar excess payment at the rate of one million dollars per year, and "we are still doing it." In any event, the language may be readily interpreted to mean that it is being amortized at the rate of one million per year for the purpose of computation in the contract between Alcoa and Cyprus.

Third, it is that "excess consideration" which produced a valuation of "land, plant and equipment on June 30, 1967, [of] $12,718,000." As the district court properly found, "the figure $12,718,000 contained in the last sentence of paragraph 2(a) . . . is based on the January 22nd valuation date instead of March 31, 1959. . . ." *Emor, Inc.*, supra, 325 F.Supp. at 947.

Thus, the remainder of paragraph 2(a) points to the conclusion that Janu-

sues of fact in connection with contract actions. Indeed, when dealing with contract actions, in certain circumstances, the court of appeals may draw inferences which approach making independent findings of fact. See, e. g., Dingman v. United States, 429 F.2d 70 (8th Cir. 1970).

4. This fact was acknowledged by the district court:

The excess consideration which Alcoa calculated in 1959 that it paid for Old Rome over book value was determined by . . . $30,327,420, the total consideration. . . . Alcoa amortized the excess consideration at the rate of $1,000,000 per year over a period of 13 plus years.
Emor, Inc., 325 F.Supp. at 946.

ary 22nd was the valuation date intended by the parties and not the date of the physical transfer of the property. Perhaps the most telling point is the specific figure used in the last sentence of paragraph 2(a). The district court, however, dismissed this figure as simply "inaccurate" because of its prior conclusion that excess consideration was based upon the valuation date of March 31, 1959.

Even were we to assume, arguendo, that the valuation date by which the parties intended to value the "excess consideration" specified in paragraph 2(a) is not defined clearly, our analysis would nevertheless compel the conclusion that January 22nd was the date which this court should utilize in reaching a valuation of "excess consideration." [5]

Assuming that the date is ambiguous, the *formula* presented in paragraph 2(a), however, is exact. Taking the allegations of the parties at face value, both Cyprus and Alcoa knew and assumed that the value had been established on the basis of a specific date. However, Cyprus argues that it had a date in mind which was different from Alcoa's.

██ Contract law has developed rules to deal with such latent ambiguities:

> . . . the meaning given to the words by one party should be given effect if the other party knew or had reason to know that it was in fact so given. If the words of the contract are to be attributed to both parties alike, in equal degree, it can not in advance be determined which party's meaning should be made effective. It is then necessary to determine whether either party knew or had reason to know the meaning that was actually given to the words by the other party. (footnotes omitted)
> 3 Corbin, On Contracts, § 537, at 51–42 (1960).

This rule has been stated in a variety of contexts, in many cases. For example, in Perry and Wallis, Inc. v. United States, 427 F.2d 722, 725, 192 Ct.Cl. 310 (1970), the court said:

> A party who willingly and without protest enters into a contract with knowledge of the other party's interpretation of it is bound by such interpretation and cannot later claim that it thought something else was meant. (citations omitted.)

Equally apt is the language in Cresswell v. United States, 146 Ct.Cl. 119, 173 F.Supp. 805, 811 (1959):

> If one party to a contract knows the meaning that the other intended to convey by his words, then he is bound by that meaning. *The same is true if he had reason to know what the other party intended.* . . . (citations omitted.)

As the preceding language makes clear, it is not necessary that the party *actually know* the other party's intent; it is enough that he had "reason to know."

These rules of contract interpretation are the rules also applied in Pennsylvania. Koplin v. Franklin Fire Ins. Co., 160 Pa.Super. 182, 50 A.2d 746 (1947); cf. Logan v. Wiley, 357 Pa. 547, 55 A.2d 366 (1947); Safe Deposit & Trust Co. of Pittsburgh et al. v. Bovaird and Seyfang Mfg. Co., 229 Pa. 295, 78 A. 268 (1910).

In the instant case, the district court found that Alcoa had ". . . consistently used January 22, 1959 as the valuation date." Among the many factors leading to this conclusion, were, as the district court noted:

> The propriety of Alcoa in using the January 22nd valuation date cannot be questioned in paying Federal Stock Issuance and Transfer Taxes; in complying with § 603 of the Pennsylvania Business Law; in advising Old Rome stockholders that the 355,226 shares of Alcoa common stock to be

---

5. This would, of course, be an assumption much in Cyprus' favor. As we have stated, the words of paragraph 2(a) will not support the conclusion that March 31st is the correct valuation date. Indeed, as stated above, the paragraph strongly suggests that January 22nd is the correct date.

paid by Alcoa would be valued as of January 22, 1959; in listing the 355,226 additional shares as of January 22nd with the New York Stock Exchange; and in evidencing that date in 1965 and 1966 divestiture proceedings in the District Court for the Northern District of New York. *Emor, Inc.*, supra, 325 F.Supp. at 946.

■ The district court found as a fact that Cyprus had knowledge or the means of knowledge that Alcoa intended January 22nd as the valuation date.

The district court noted that:

The method and amount by which the excess consideration had been calculated by Alcoa had been presented in the divestiture hearing, and the unamortized amount of such excess consideration as of December 31, 1964, had been included by Judge Brennan in the amount of adjusted book value as of the date set forth in the Final Judgment. *Without doubt, Cyprus had the knowledge or the means of knowledge of the method and amount so calculated prior to August 25, 1967 when it executed the Sales Agreement.* The April 30, 1967 calculation specifically disclosed $5,562,000 as "unamortized purchase premium." *Emor, Inc.,* supra, at 948–949. (Citations to exhibits and transcripts omitted; emphasis supplied).

A review of the evidence confirms the correctness of the district court's findings. To give but one example, on August 4, 1967, a mere twenty days before Cyprus sent the executed sales agreement to Alcoa, Leon Hickman, executive vice president of Alcoa, wrote to W. E. Hosken, vice president of the Cyprus Mines Corporation. This letter included

a "calculation of the minimum price for which the company is being held." Included therein, was a figure for "adjusted book value" of $12,718,000, based on the January 22, 1959, valuation date. This figure was "as of June 30, 1967." Indeed, in the draft report and the formal report of the planning department of Cyprus dated August 7, 1967 prepared by Cyprus to determine whether it wished to consummate the sale, it unequivocally acknowledged its understanding that Alcoa was using the January date.[6]

In contradistinction, no evidence suggests that Alcoa knew or should have known, that Cyprus believed that March 31 was the date intended by the terms of paragraph 2(a). Indeed, no evidence was presented that Cyprus, in conversations or communications with Alcoa, ever deviated from Alcoa's assumption of January 22nd. In any event, it appears that Cyprus had not attempted to dispute the reasonable inference that it knew that Alcoa considered January 22nd as the valuation date.

As we view it, the findings of the trial judge indicate that Cyprus, fully aware of Alcoa's use of the January date for stock valuation purposes in the negotiations and proposed sales agreement, willingly entered into the contract. Cyprus "knew or had reason to know the meaning that was actually given to the words by the other party" *Corbin, id.,* before signing the contract. It neither protested nor otherwise expressed any disagreement with Alcoa. It may not now claim after harvesting the fruits of the agreement that it thought something else was intended.

Cyprus contends that Alcoa stated an excessive sum for the unamortized ex-

6. The report of August 7, 1967, carefully analyzed the upset price calculation established by the United States District Court for the Northern District of New York under the divestiture order. The excess consideration based on the January 22nd date is specifically set forth and is based on an analysis of the Cyprus accounting department. The report makes this pertinent comment: "The

first item under the column headed *Adjustments* on Table XIV is the unamortized balance on Alcoa's books of the excess price it paid over book value for Rome in 1959. Alcoa purchased Rome stock with Alcoa stock and could not revalue the Rome assets for tax purpose. At the time of Alcoa's acquisition of Rome the excess over book was approximately $13 million."

cess consideration paid to Old Rome in 1959. Its argument is ingeniously built upon the hollow premise that at the time of the purchase of Old Rome's assets and business in 1959 by Alcoa the parties had erroneously computed the value of Alcoa's stock on the basis of its price on January 22, 1959, instead of March 31, 1959. In support of the proposition, Cyprus has vigorously argued that "excess consideration" paid by Alcoa could not have been based on the value of its stock on January 22, 1959 since the transaction was subject to the approval of Old Rome's shareholders, an approval not forthcoming until March 25, 1959. Moreover, it asserts that the formal plan and agreement between the parties was not completed until February 17, 1959; and all of its conditions were not satisfied until March 31, 1959, when the exchange of Old Rome's assets and business was consummated for Alcoa's capital stock.

Whether Alcoa and Old Rome made an erroneous calculation of the value of Alcoa's stock in the 1959 transaction, and we are convinced that they did not, is irrelevant in the construction of paragraph 2(a) in the 1967 sales agreement with Cyprus. The only question presented by the agreement is whether it states the amount of the excess consideration agreed to by the parties in the 1959 transaction. In any inquiry to ascertain the consideration ultimately "paid" one would expect that the records of the transaction by the parties involved would be crucial. This is especially true in an acquisition involving a sale and exchange for capital stock, one of great magnitude and complexity, predicated upon considerable preliminary negotiations, compliance with legal formalities, shareholders approval, registration with the Securities Exchange Commission and listing of the stock with the New York Stock Exchange. The parties to a sophisticated transaction of this nature of course contemplated that the shares of stock of one of America's largest corporations, stock actively traded on the New York Stock Exchange, would probably not have the same value on the date of closing as it did on the date of the offer some three months earlier. In any event, what is important to us in our inquiry is how Alcoa and Old Rome, the actual parties to the transaction, dealt with the excess consideration. Old Rome's and Alcoa's records of their transaction, without evidence to the contrary, should be conclusive in this regard.

The records of Alcoa and Old Rome are certain and unequivocal. They show the amount of excess consideration recorded as $13,645,078. This was the figure submitted in the preparation of the proxy statement issued in early March of 1959 to Old Rome's stockholders. It was the figure ascertained, determined and recommended by Lybrand, Ross Bros. and Montgomery (Lybrand), certified public accountants and auditors for both Alcoa and Old Rome at the time. It was the sum approved by the board of Old Rome, approved by Rome's shareholders and recorded on Old Rome's trial balance sheet as of March 31, 1959, as an asset in the nature of "Excess acquisition cost." It was obviously computed on the basis of the value of the stock on January 22, 1959 of $85.375 per share. It is the excess consideration which the parties accepted and utilized in the transaction. In this respect, as the trial judge noted, Alcoa consistently, throughout the transaction with Old Rome and since, treated $13,645,078 as the consideration actually paid in complying with § 603 of the Pennsylvania Business Law; in advising Old Rome shareholders, in listing the 355,226 shares with the New York Stock Exchange; and in the divestiture proceedings in the District Court for the Northern District of New York. With this sum as the consideration paid, the final sentence of paragraph 2(a) as stated by the parties in the Cyprus agreement is

meaningful and is accurate.[7] The figure therein of $12,718,000 is consistent with what the parties concerned in 1959 utilized and recorded. These are the critical considerations.

## II. INTERPRETATION OF PARAGRAPH 2(b).

Another important issue is also here on the cross-appeal of Cyprus. This issue concerns the determination of the price to be paid for the copper contained in Rome's inventories on October 31, 1967, the date of closing. It also turns on the interpretation of the sales contract of October 2, 1967, in this instance paragraph 2(b). On this issue we are in agreement with all aspects of the lengthy and detailed district court opinion.

Paragraph 2(b) provided, inter alia, that the copper content of inventories "shall be valued at the higher of market value or cost thereof on the Closing Date—with cost being determined on a first-in first-out basis, without deduction of reserves for Lifo." *Emor, Inc.,* supra, 325 F.Supp. at 937. Since the amount of Alcoa's cost was agreed upon, the only question was the market value of the copper content of Rome's inventories.

■ The district court found "as a fact that the 'copper content' to be valued had been expressed by Alcoa and acquiesced in by Cyprus *in terms of wire bar.*" *Emor, Inc.,* supra at 942. (emphasis supplied). In other words, the district court found that the term "copper content," as used by the parties meant: ". . . the total weight of copper recorded in Rome's copper metal value account in its basic raw material form of electrolytic wire bar" even though the copper might be, in fact, presently in other forms because of processing.[8]

Several important reasons motivated the district court's conclusion. First, the district court found that:

. . . Cyprus was aware of Rome's metal accounting method. . . . These accounts recorded the total weight and cost of these metals in their basic raw material forms without regard to the physical forms in which the metals actually existed in the inventory as scrap, raw material, work in process and finished goods. The metal value account for copper was so recorded and maintained in the

---

7. It was based upon the letter delivered by Alcoa to Mr. Mudd, Chairman of the Board of Cyprus, dated August 15, 1967. This letter stated that Alcoa would entertain an offer from Cyprus and set forth a formula for determining the purchase price which provided for the inclusion in book value of land, plant and equipment "the amount by which the consideration paid by Alcoa in 1959 to the former Rome Cable Corporation for its assets and business exceeded the net book value of said assets. . . . " less amortization of that excess consideration to the date of closing at the rate of $1,000,000 per year. The letter further provided that "[t]he valuation of land, plant and equipment on this basis on June 30, 1967 was $12,718,000."

8. The district court succinctly stated the specific amounts and forms of the copper content of the inventories and Rome's metal accounting method in the following terms:

"As of October 31, 1967, the copper content of the inventories of Rome was

22,889,729 pounds broken down in the following forms:

| | |
|---|---|
| Scrap | 2,526,360 pounds |
| Raw materials (wire bar) | 3,508,507 pounds |
| Work in process | 4,753,089 pounds |
| Finished goods | 12,101,773 pounds |

\* \* \* \* \* \*

The metal value account for copper was so recorded and maintained in the basic raw material form of electrolytic wire bar. The added cost that accrued during the manufacturing of products containing the metals was maintained in separate conversion accounts. The cost of converting copper scrap back to wire bar was maintained as a credit or offsetting amount in a separate account and was not posted to the copper metal account.

"Under the concept of metal value accounting as used by Rome and other metal fabricators, the 'copper content' of Rome's inventories means the total weight of copper recorded in Rome's copper metal value account in its basic raw material form of electrolytic wire bar." *Emor, Inc.,* supra at 938.

basic raw material form of electrolytic wire bar. *Emor, Inc.*, supra at 938. The district court also noted that:

At no time during preliminary discussion . . . was the term 'copper content' articulated by the parties to mean anything different from the customary usage of that term by Rome, i. e., the total weight of copper recorded in Rome's copper metal value account in its basic raw material form. This was the general and customary usage of that term by the industry. *Emor, Inc.*, supra at 940.

In its brief to this court, Cyprus admits that "the fabricating industry regards 'copper . content' of its products *conceptually* to be wirebar." (emphasis supplied). But it argues that the:

. . . industry just like the accounting profession, does not value copper inventory simply on the basis of wirebar prices, because the value of the copper in inventory may vary greatly on a given day from the value of the wirebar and fabricators may well realize less value from copper inventory than its cost. (citations omitted).

As we view it, Cyprus does not directly challenge any of the conclusions of the district court with this argument. It merely asserts that the value which Rome would have realized had it had to liquidate its copper inventories in their actual form, would have been considerably less than the price figures in terms of wire bar. This argument is without merit. The critical finding of the trial judge is that the parties used the wire bar formulation in their discussions, and that this was the general and customary usage of that term by the industry. Indeed, by conceding that "conceptually" the industry used the term copper content to mean "wirebar," Cyprus comes close to accepting the district court's premises.

It is important to keep in mind that paragraph 2(b) *itself* spells out how the "copper content" is to be valued. The arguments of Cyprus that "industry just like the accounting profession, does not

*value* copper inventory . . . on the basis of wirebar prices . . ." must be read in this light. (emphasis supplied). The parties intended to label a commodity—"copper content"—and then define the means of valuing that entity. In this light, the critical phrase, "copper content," must be understood in terms of its normal usage, and not in reference to a specific method of valuation.

Cyprus next challenges the construction which the district court gave to the phrase "market value" in paragraph 2(b). The district court determined that "market value," as used by the parties, meant:

. . . 'market value of copper bar from the legal standpoint', i. e., the price agreed upon by a buyer willing but not obligated to buy, and a seller, willing but not obligated to sell electrolytic wire bar. *Emor, Inc.*, supra at 943.

Further, the district court noted that:

Since the strike had dried up domestic sources of copper, the negotiators, *sub silentio*, expected market value to be determined in accordance with the legal definition from quotations on the open market, i. e., the Dealer Market. *Id.* at 941.

The district court selected the "Dealer Market" for several reasons. First, because:

The Dealer Market is traditionally known as a free and open market with prices therein being affected by supply and demand similar to a free and open market for any other commodity. *Emor, Inc.*, supra at 941.

Second, because no other markets seemed to meet the requirement of being "free and open," at least insofar as copper was concerned, especially on the dates relative to the contract. Additionally, although the judge expressly chose not to rely upon a series of letters between Cyprus and Alcoa "following the closing date and after the dispute arose," the district court noted that these letters supported his interpretation. Finally, the district court, in an

extensive analysis, reviewed the entire history of the formulation of paragraph 2(b), concluding that the actions of the parties showed that "market value" had been used, continually, by them to mean the "Dealer Market." Thus, for example, the district court found that:

A meeting to discuss the terms of the sale was held in Los Angeles on August 15, 1967. . . . Price changes were mentioned and discussed indicating that the participants were thinking in terms of the fluctuating Dealer Market. . . . *Emor, Inc.,* supra at 939.

And concluded:

. . . we are convinced that the Cyprus officers were thinking of copper prices in terms of the fluctuating Dealer Market as of the closing date. *Id.* at 940.

Cyprus advances several challenges to the reasoning of the district court. Its primary argument, in its brief to this court, is that:

. . . the *essence of the trial court's reason* for finding that Cyprus must pay 64 cents [Dealer Market Price] for property worth only 46 cents was because there was no 'market' for copper content. (emphasis supplied).

This argument is based, simply, on a misreading of the district court's opinion. Cyprus draws our attention to the following dialogue between the district court and the attorney for Alcoa during the final argument held a month before the parties filed their briefs and requests for findings of fact and conclusions of law:

The Court: Copper content now, of course, with reference to cost has a meaning. I can see it. But, copper content has no meaning with respect to market value because there is no market—

\* \* \* \* \* \*

The Court: We agree, Mr. Seamans. There is no market value for copper content.

Mr. Seamans: Yes.

The Court: That is what they put in their agreement.

Mr. Seamans: Yes.

The Court: So what does the Court do when the parties put into the agreement something that doesn't exist?

Whether or not this colloquy shows uncertainty on the part of the district court at closing arguments, there is none in the opinion of the district court, an opinion reflecting careful analysis and thought, detailed findings of fact and conclusions of law. In its opinion, the district court explains the reasons for its finding that the parties intended "Market Value" to mean value as defined on the Dealer Market. It described the "operative usages" and "facts and circumstances" relating to the terms "copper content" and "market value" and its interpretation of those terms on the basis of established legal principles of contract interpretation. Thus, it concluded that "copper content," as used in paragraph 2(b), meant the total weight of copper in Rome's inventories as of the closing date measured in its raw material form of copper wire bar; and that "market value" as used in the paragraph, meant the market value of copper wire on the closing date in accordance with the legal definition of market value, namely its price which would be agreed upon by a willing buyer and a willing seller. These reasons are alluded to above, and have no reference to whether or not there is a market for "copper content"—that is, a market for the content of copper which has been made into products and combined with other materials. Since the district court had already determined that the parties intended "copper content" to be expressed in terms of "wirebar," it would have been improper to the conclusion of the district court to determine whether the copper content—construed in terms of its value as a metal, combined with other metals into products—had a ready market.

It should be noted that, of course, an important interrelationship exists be-

tween the findings of the district court in reference to "copper content" and "market value." A conclusion on one issue reinforces the conclusion on the other. Cyprus recognizes this fact when it notes in its brief to this court that:

> . . . what the trial court 'did' was to find 'sub silentio agreements' to value Rome's copper content as wirebar which *perforce* must be valued by reference to the wirebar Dealer Market. (emphasis supplied).

It is also evident that throughout Cyprus' argument on this issue is the groundless assumption that Rome's metal inventory was purchased as a separate and specific commodity, and that the unfavorable price would place Cyprus at a disadvantage with its competitors. On this theory, it argues that 64¢ per pound of copper as market value should be disregarded because the strike against the major United States producers created a highly abnormal copper market in the United States. However, this strike was in progress throughout the negotiations and execution of the sales agreement. Copper prices in the open market have fluctuated widely during substantial periods from 1965 to 1970. They have been customarily influenced by events occurring in various parts of the world. The price which prevailed in the open market on October 31, 1967, was not, as Cyprus argues, a "peculiar circumstance." In fact, during the trial the market price was around 66½¢ per pound. *Emor, Inc.*, supra at 944.

Of greater significance, however, was the finding of the trial judge that Cyprus intended to purchase the assets and business of Rome as a going concern for a single lump sum purchase to be computed according to the provisions set forth in the sales agreement:

> Cyprus did not concern itself with whether the various assets of Rome were worth any particular amount.

> . . . Cyprus was principally concerned with the anticipated earnings of Rome . . . and other benefits that were expected to accrue. . . . Cyprus did not purchase the individual assets of Rome as part of a liquidation sale; it treated the purchase price of Rome as a lump sum consideration. *Emor, Inc.*, supra at 935.

The district court made two other passing observations in this connection which provide insight into the position of the parties in negotiation and at closing:

1. Alcoa, after successfully operating Old Rome's business since 1959 as a going concern was being compelled to sell by a divestiture order at a minimum upset price fixed by court formulas. Thus, its trading position was "handicapped in its bona fide efforts to sell Rome at the best price possible." *Emor, Inc.*, supra at 935. This was a great advantage to Cyprus in these negotiations.

2. Cyprus was purchasing:

> . . . an entire company comprised of many individual assets, tangible and intangible . . . not buying finished products of Rome, its scrap metal or its inventories as such. The market value of copper wire bar on the closing date was one of the measuring sticks to be used in arriving at the total purchase price of Rome. *Emor, Inc.*, supra, at 943.

We have considered each of the other arguments advanced by Cyprus and find them without merit.

The judgment of the district court will be vacated and the case remanded for the entry of judgment in favor of Alcoa in accordance with this opinion. Costs to be taxed against the appellee, Cyprus Mines Corporation, in appeals No. 71–1671 and No. 71–1672 and costs to be allowed Emor, Inc. and Delcalo, Inc. in appeal No. 71–1673 in which Cyprus Mines Corporation is the appellant.